# CALIFORNIA EX REL. STATE LANDS COMMISSION v. UNITED STATES

No. 89, Orig.   Argued March 29, 1982—Decided June 18, 1982

274

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, and POWELL, JJ., joined. REHNQUIST, J., filed an opinion concurring in the judgment, in which STEVENS and O'CONNOR, JJ., joined, *post*, p. 288.

*Bruce S. Flushman*, Deputy Attorney General of California, argued the cause for plaintiff. With him on the briefs were *George Deukmejian*, Attorney General, *N. Gregory Taylor*, Assistant Attorney General, and *Dennis M. Eagan* and *Patricia Sheehan Peterson*, Deputy Attorneys General.

*Deputy Solicitor General Claiborne* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Dinkins*, and *Michael W. Reed.**

---

*A brief of *amici curiae* was filed for the State of Washington et al. by *Kenneth O. Eikenberry*, Attorney General of Washington, *Malachy R. Murphy*, Deputy Attorney General, and *Robert C. Hargreaves*, Assistant Attorney General; *Charles A. Graddick*, Attorney General of Alabama, and *Sarah M. Spratling*, Assistant Attorney General; *Wilson L. Condon*, Attorney General of Alaska, and *G. Thomas Koester*, Assistant Attorney General; *Robert K. Corbin*, Attorney General of Arizona, and *Anthony B. Ching*, Solicitor General; *Tany S. Hong*, Attorney General of Hawaii, and *Johnson H. Wong*, Deputy Attorney General; *Jeff Bingaman*, Attorney

JUSTICE WHITE delivered the opinion of the Court.

The issue before the Court is the ownership of oceanfront land created through accretion to land owned by the United States on the coast of California. The decision turns on whether federal or state law governs the issue.

## I

From the time of California's admission to the Union in 1850, the United States owned the upland on the north side of the entrance channel to Humboldt Bay, Cal. In 1859 and 1871, the Secretary of the Interior ordered that certain of these lands, which fronted on the Pacific Ocean, the channel, and Humboldt Bay be reserved from public sale.[1] Since that time the land has been continuously possessed by the United States and used as a Coast Guard Reservation. The Pacific shoreline along the Coast Guard site remained substantially unchanged until near the turn of the century when the United States began construction of two jetties at the entrance to Humboldt Bay.[2] The jetty constructed on the north side of the entrance resulted in fairly rapid accretion on the ocean side of the Coast Guard Reservation, so that formerly submerged lands became uplands.[3] One hundred and eighty-

General of New Mexico, and *J. Scott Hall*, Special Assistant Attorney General; and *Dave Frohnmayer*, Attorney General of Oregon, and *Peter Herman*, Senior Assistant Attorney General.

[1] Secretarial Order, December 27, 1859; Secretarial Order, August 19, 1871. See Exhibit C to Exhibits in Support of California's Motion for Leave to File Complaint.

[2] Construction of the jetties commenced on the South Spit in 1889 and on the North Spit in 1890. U. S. Army Corps of Engineers, San Francisco District, Survey Report on Humboldt Bay, California, App. I, Shoreline Changes 2–3, 8–9 (Feb. 10, 1950), Exhibit D (hereafter cited as Corps Report). The north jetty was a massive work, having a total length of 7,500 feet.

[3] The United States and California agree that the seaward shift of the shoreline was caused by the construction of the jetties. A study by the Army Corps of Engineers found:

four acres of upland were created by the seaward movement of the ordinary high-water mark. This land, which remains barren save for a watchtower, is the subject of the dispute in this case.

The controversy arose in 1977 when the Coast Guard applied for permission from California to use this land to construct the watchtower.[4] At this time it became evident that both California and the United States asserted ownership of the land. The United States eventually built the watchtower without obtaining California's permission.[5] Invoking our original jurisdiction, California then filed this suit to

---

"With the inauguration of jetty construction in 1890, there began a series of interruptions in normal littoral transport [of sand]. With each increment in length of the jetties the [Humboldt] bar was pushed seaward. Consequent decrease in offshore depths caused the shore to advance on each side of the inlet." *Id.*, at 8, ¶ 21.

After jetty construction,

". . . the Humboldt bar . . . shifted and reformed seaward of its 1870 position, and the ocean high-water shore line along the north spit . . . shifted seaward. The seaward advance of the north spit shore line was most pronounced upon reconstruction of the north jetty in 1917." *Id.*, at 9, ¶ 25.

[4] California does not contend that, having applied for a state permit, the United States is estopped from asserting its claim to ownership of the disputed land. Tr. of Oral Arg. 5–6. Such an argument is foreclosed by *United States* v. *California*, 332 U. S. 19, 39–40 (1947) (footnote omitted): "[O]fficers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act." See also *United States* v. *City and County of San Francisco*, 310 U. S. 16, 31–32 (1940); *Utah* v. *United States*, 284 U. S. 534, 545–546 (1932).

[5] In May 1978, California transmitted a proposed permit to the United States to allow construction of the watchtower. See Corps Report, Exhibit F. A few days later, the Bureau of Land Management of the Department of the Interior formally advised the Coast Guard and the California Commission that the United States claimed the disputed acreage as accretion. Letter of June 5, 1978, attached to Corps Report, Exhibit G. The proposed permit was never executed.

quiet title to the subject land.[6] We granted leave for California to file a bill of complaint. 454 U. S. 809 (1981).

California alleges that upon its admission to the Union on September 9, 1850, Act of Sept. 9, 1850, 9 Stat. 452, and by confirmation in the Submerged Lands Act, 67 Stat. 29, 43 U. S. C. § 1301 *et seq.*, California became vested with absolute title to the tidelands and the submerged lands upon which, after construction of the jetties, alluvion was deposited, resulting in formation of the subject land. Because the accretion formed on sovereign state land, California maintains that its law should govern ownership. Under California law, a distinction is drawn between accretive changes to a boundary caused by natural forces and boundary changes caused by the construction of artificial objects. For natural accretive changes, the upland boundary moves seaward as the alluvion is deposited, resulting in a benefit to the upland owner. *Los Angeles* v. *Anderson*, 206 Cal. 662, 667, 275 P. 789, 791 (1929). When accretion is caused by construction of artificial works, however, the boundary does not move but becomes fixed at the ordinary high-water mark at the time the artificial influence is introduced. *Carpenter* v. *Santa Monica*, 63 Cal. App. 2d 772, 794, 147 P. 2d 964, 975 (1944). It is not disputed that the newly formed land in controversy was created by the construction of the jetty. Therefore, if state law governs, California would prevail.

---

[6] Disputes between a State and the United States over ownership of property are fully within our original jurisdiction over cases in "which a State shall be Party," Art. III, § 2, cl. 2. Although our jurisdiction over this matter is concurrent with that of the district courts, *California* v. *Arizona*, 440 U. S. 59, 65 (1979); 28 U. S. C. § 1251(b)(2), we have previously indicated that coastal boundary disputes are appropriately brought as original actions in this Court. *United States* v. *Alaska*, 422 U. S. 184, 186, n. 2 (1975).

The United States has waived its immunity to suit in actions brought against it to quiet title to land. 28 U. S. C. § 1346(f). See *California* v. *Arizona, supra*, at 65–68.

By its answer, and supporting memoranda, the United States contends that the formerly submerged lands were never owned by California before passage of the Submerged Lands Act in 1953, and that the disputed land was not granted to California by the Act. The United States also submits that the case is governed by federal rather than state law and that under long-established federal law, accretion, whatever its cause, belongs to the upland owner. *Jones* v. *Johnston*, 18 How. 150, 156 (1856); *County of St. Clair* v. *Lovingston*, 23 Wall. 46, 66 (1874); *Jefferis* v. *East Omaha Land Co.*, 134 U. S. 178, 189–193 (1890); *Beaver* v. *United States*, 350 F. 2d 4, 10–11 (CA9 1965).[7] If such federal law controls, title to the deposited land vested in the United States as the accretions formed.

Recognizing that the choice-of-law issue was clearly drawn, California moved for summary judgment and the United States moved for judgment on the pleadings. No essential facts being in dispute, a special master was not appointed and the case was briefed and argued. We conclude that federal law governs the decision in this case and that the land in dispute is owned by the United States.

## II

In *Borax Consolidated, Ltd.* v. *Los Angeles*, 296 U. S. 10 (1935), the city filed suit to quiet its title to land claimed to be tideland and to belong to the city by virtue of a grant from the State. The defendant claimed by virtue of a patent from the United States issued after California entered the Union. In an opinion by Chief Justice Hughes, and with a single dis-

---

[7] California's claim that *Wilson* v. *Omaha Indian Tribe*, 442 U. S. 653, 672 (1979), determined that there was no "federal common law" of accretion and avulsion, is a misunderstanding of that decision. We said only that "[t]he federal law applied in boundary cases . . . does not necessarily furnish the appropriate rules to govern" a case not involving a boundary dispute. Too much is also read into dictum in *Oregon ex rel. State Land Board* v. *Corvallis Sand & Gravel Co.*, 429 U. S. 363, 380–381, n. 8 (1977), taking issue with the dissent's meaning of the term "federal common law."

sent, the Court held that if the land in question was tideland, the title passed to California at the time of her admission to the Union in 1850; that it remained to be determined whether the land at issue was tideland; and that this issue was "necessarily a federal question" controlled by federal law. The Court said:

> "Petitioners claim under a federal patent which, according to the plat, purported to convey land bordering on the Pacific Ocean. There is no question that the United States was free to convey the upland, and the patent affords no ground for holding that it did not convey all the title that the United States had in the premises. The question as to the extent of this federal grant, that is, as to the limit of the land conveyed, or the boundary between the upland and the tideland, is necessarily a federal question. It is a question which concerns the validity and effect of an act done by the United States; it involves the ascertainment of the essential basis of a right asserted under federal law. *Packer* v. *Bird,* 137 U. S. 661, 669, 670; *Brewer-Elliott Oil Co.* v. *United States,* 260 U. S. 77, 87; *United States* v. *Holt Bank,* 270 U. S. 49, 55, 56; *United States* v. *Utah,* 283 U. S. 64, 75. Rights and interests in the tideland, which is subject to the sovereignty of the State, are matters of local law. *Barney* v. *Keokuk,* 94 U. S. 324, 338; *Shively* v. *Bowlby,* [152 U. S. 1,] 40; *Hardin* v. *Jordan,* 140 U. S. 371, 382; *Port of Seattle* v. *Oregon & Washington R. Co.,* 255 U. S. 56, 63." *Borax Consolidated, Ltd.* v. *Los Angeles, supra,* at 22.

The Court went on to hold that tidelands extend to the mean high-water line, which the Court then defined as a matter of federal law.

There was no question of accretions to the shoreline of the property involved in *Borax.* But some 30 years later, Mrs. Stella Hughes, the successor in interest to the owner of oceanfront property patented by the United States prior to

the entry of the State of Washington into the Union, sued the State seeking to quiet her title to accretions that had become attached to her land and that had caused a seaward movement of the shoreline. Under Washington law, the accretions belonged to the State, the owner of the tidelands, and Mrs. Hughes would no longer own property fronting on the ocean. Under federal law accretions are the property of the upland owner. The trial court found that federal law applied. The Washington Supreme Court reversed, holding that Washington law applied and that the State owned any land that accreted after statehood. *Hughes* v. *State*, 67 Wash. 2d. 799, 410 P. 2d 20 (1966).

We in turn reversed, reaffirming the decision in *Borax* that federal law determined the boundary between state-owned tidelands and property granted under a federal patent and holding that the same law applied to determine the boundary between state-owned tidelands and oceanfront property where accretions had extended the shoreline seaward. *Hughes* v. *Washington*, 389 U. S. 290 (1967).[8] The justification for employing federal law was the special nature of the coastal boundary question: "The rule deals with waters that lap both the lands of the State and the boundaries of the international sea. This relationship, at this particular point of the marginal sea, is too close to the vital interest of the Nation in its own boundaries to allow it to be governed by any law but the 'supreme Law of the Land.'" *Id.*, at 293. We went on to decide that under federal law, the federal grantee of the uplands had the right to the accumulated accretions.

Except for the fact that in the present case the upland to which the accretions attached has always been owned by the United States, this case and *Hughes* are similarly situated.

---

[8] All participating Justices joined except Justice Stewart, who concurred on grounds that the State's claim to the property constituted a taking without compensation. He rejected the majority's application of federal law to the question. JUSTICE MARSHALL took no part in the case.

Unless *Hughes* is to be overruled, judgment must be entered for the United States.

California urges that for all intents and purposes *Hughes* has already been eviscerated by *Oregon ex rel. State Land Board* v. *Corvallis Sand & Gravel Co.*, 429 U. S. 363 (1977). *Corvallis* involved a dispute between the State of Oregon and an Oregon corporation over the ownership of land that became part of a riverbed because of avulsive changes in the river's course. The Oregon Court of Appeals affirmed the trial court's award of the land to the corporation because that was the result dictated by federal common law, which, under *Bonelli Cattle Co.* v. *Arizona*, 414 U. S. 313 (1973), was the proper source of law. A majority of this Court reversed, overruling *Bonelli* and holding that the disputed ownership of the riverbed should be decided solely as a matter of Oregon law. *Bonelli*'s error was said to have been reliance on the equal-footing doctrine as a source of federal common law.[9] Once the equal-footing doctrine had vested title to the riverbed in Arizona, "it did not operate after that date to determine what effect on titles the movement of the river might have." 429 U. S., at 371. State, rather than federal law, should have been applied.

California urges that in rejecting *Bonelli* and holding that disputes about the title to lands granted by the United States are to be settled by state law, the Court also rejected *Hughes* since that case involved land that had been patented by the United States to private owners. We do not agree. *Corvallis* itself recognized that federal law would continue to apply if "there were present some other principle of federal law requiring state law to be displaced." 429 U. S., at 371. For example, the effects of accretive and avulsive changes in the

---

[9] The equal-footing principle holds that all States admitted to the Union possess the same rights and sovereignty as the original 13 States. *Pollard's Lessee* v. *Hagan*, 3 How. 212, 229 (1845); *Shively* v. *Bowlby*, 152 U. S. 1, 26, 30 (1894).

course of a navigable stream forming an interstate boundary is determined by federal law. *Id.*, at 375. The *Corvallis* opinion also recognized that *Bonelli* did not rest upon *Hughes* and that the *Hughes* Court considered oceanfront property "sufficiently different . . . so as to justify a 'federal common law' rule of riparian proprietorship." 429 U. S., at 377, n. 6. The *Corvallis* decision did not purport to disturb *Hughes*.

*Wilson* v. *Omaha Indian Tribe*, 442 U. S. 653 (1979), made clear that *Corvallis* also does not apply "where the [United States] Government has never parted with title and its interest in the property continues." 442 U. S., at 670.[10] The dispute in *Corvallis* was between the State and a private owner of land previously in federal possession. In contrast, the riparian owner in *Wilson* was the United States, holding reservation land in trust for the Omaha Indian Tribe. The issue was the effect of accretive or avulsive changes in the course of a navigable stream. State boundaries were not involved. What we said in *Wilson* is at least equally applicable here where the United States has held title to, occupied, and utilized the littoral land for over 100 years: "[T]he general rule recognized by *Corvallis* does not oust federal law in this case. Here, we are not dealing with land titles merely derived from a federal grant, but with land with respect to which the United States has never yielded title or terminated its interest." 442 U. S., at 670.

---

[10] The majority opinion in *Corvallis* appears to recognize that its rule does not extend to land remaining in federal hands:

" 'We hold the true principle to be this, that whenever the question in any Court, state or federal, is, *whether* a title to land which had once been property of the United States has passed, that question must be resolved by the laws of the United States; but that *whenever*, according to these laws, *the title shall have passed*, then that property, like all other property in the state, is *subject to state legislation;* so far as that legislation is consistent with the admission that the title passed and vested according to the laws of the United States.' " 429 U. S., at 377 (quoting *Wilcox* v. *Jackson*, 13 Pet. 498, 517 (1839); emphasis added by *Corvallis* Court).

We conclude, based on *Hughes* v. *Washington* and *Wilson* v. *Omaha Indian Tribe*, that a dispute over accretions to oceanfront land where title rests with or was derived from the Federal Government is to be determined by federal law.

### III

Controversies governed by federal law do not inevitably require resort to uniform federal rules. *Wilson* v. *Omaha Indian Tribe, supra*, at 672. It may be determined as a matter of choice of law that, although federal law should govern a given question, state law should be borrowed and applied as the federal rule for deciding the substantive legal issue at hand. *Board of Commissioners of Jackson County* v. *United States*, 308 U. S. 343 (1939); *Royal Indemnity Co.* v. *United States*, 313 U. S. 289 (1941). This is not such a case. First, and dispositive in itself, is the fact that Congress has addressed the issue of accretions to federal land. The Submerged Lands Act, 43 U. S. C. § 1301 *et seq.*, vested title in the States to the lands underlying the territorial sea, which, in California's case, extended three miles seaward from the ordinary low-water line. The Act also confirmed the title of the States to the tidelands up to the line of mean high tide. Section 5(a) of the Act, however, withheld from the grant to the States all "accretions" to coastal lands acquired or reserved by the United States.[11]  43 U. S. C. § 1313(a). In

---

[11] In relevant part, § 5(a) of the Act, 62 Stat. 32, 43 U. S. C. § 1313(a), excepts from the grant to the States

"all tracts or parcels of land together with all accretions thereto, . . . title to which has been lawfully and expressly acquired by the United States . . . and . . . all lands expressly retained by or ceded to the United States when the State entered the Union . . . ."

Although "accretions" are expressly mentioned only in connection with federal "acquired lands," accretions to retained lands should be similarly excepted from the grant to the States. Former Solicitor General Cox, in an opinion approved by the Attorney General, explained:

"There can be no doubt that Congress intended each of the various categories of lands excepted by section 5(a) to include accretions. The terms

light of this provision, borrowing for federal-law purposes a state rule that would divest federal ownership is foreclosed. In *Wilson,* where we did adopt state law as the federal rule, no special federal concerns, let alone a statutory directive, required a federal common-law rule.

Moreover, this is not a case in which federal common law must be *created.* For over 100 years it has been settled under federal law that the right to future accretions is an inherent and essential attribute of the littoral or riparian owner. *New Orleans* v. *United States,* 10 Pet. 662, 717 (1836); *County of St. Clair* v. *Lovingston,* 23 Wall., at 68. "'Almost all jurists and legislators, . . . both ancient and modern, have agreed that the owner of the land thus bounded is entitled to these additions.'" *Jefferis* v. *East Omaha Land Co.,* 134 U. S., at 189, quoting *Banks* v. *Ogden,* 2 Wall. 57, 67 (1865). We rejected the invitation to rely on state law in *Hughes,* which California readily admits is a case "in which the facts and issues are essentially identical," Statement in Support of Motion for Leave to File Complaint 16, and we see no reason at this juncture to adopt California's minority rule on artificial accretions,[12] even if we were free to do so.

---

of section 5(a) make this clear. The customary rights of landowners are set forth in full in the first of the several exceptions listed in section 5(a). Thus, it speaks of 'all tracts or parcels of land together with all accretions thereto, resources therein, or improvements thereon . . . .' Each of the other exceptions speaks simply of 'all lands.' Obviously, the more comprehensive word 'lands' was used instead of 'tracts or parcels of land' and the explicit reference to accretions, resources and improvements was omitted in order to avoid repetition. There is no reasonable basis for any other conclusion. Congress would not have limited its exceptions of 'all accretions thereto, resources therein, or improvements thereon' to lands 'lawfully and expressly acquired by the United States' from any State or its grantees and then denied them where the lands were 'expressly retained' or 'acquired by the United States by eminent domain proceedings, purchase, cession, gift, or otherwise in a proprietary capacity. . . .'" 42 Op. Atty. Gen. 241, 264 (1963).

[12] In *United States* v. *California,* O. T. 1951, No. 6, Orig., California argued that the "Court should adopt the federal rule that accretions formed

Applying the federal rule that accretions, regardless of cause, accrue to the upland owner, we conclude that title to the entire disputed land in issue is vested in the United States.

## IV

Despite *Hughes* and *Wilson*, California claims ownership of the disputed lands because all of the accretions were deposited on tidelands and submerged lands, title to which, California submits, was vested in the State by the equal-footing doctrine and confirmed by the Submerged Lands Act. But California's claim to the land underlying the territorial sea was firmly rejected in *United States* v. *California*, 332 U. S. 19 (1947), which held that only land underneath inland waters was included in the initial grant to the States under the equal-footing doctrine. Furthermore, the Submerged Lands Act was a constitutional exercise of Congress' power to dispose of federal property, *Alabama* v. *Texas*, 347 U. S. 272, 273–274 (1954), and "did not impair the validity" of the *California* decision, *United States* v. *Louisiana*, 363 U. S. 1, 7, 20 (1960).[13] In any event, whatever the ownership of the submerged lands, this approach, based as it is on the equal-footing doctrine and the federal statute, is not a claim that state law should govern but a claim that the historic rule that accretions belong to the upland owner is wrong and should be

by gradual and imperceptible degrees even though induced by artificial structures accrue to the owner of the adjoining land." Brief in Relation to Report of Special Master 90. California suggested "ample reasons why [the] exceptional California view should not be extended and applied in determining the boundaries of the marginal sea off California." *Id.*, at 91. Those reasons included the fact that the California rule is contrary to that adopted by courts of most other States, that the application of state law would lead to varying results in different States, and that the California rule was devised for wholly inapplicable reasons.

[13] See also *Alabama* v. *Texas*, 347 U. S., at 273–274; *United States* v. *California*, 381 U. S. 139, 145–148 (1965); *United States* v. *Louisiana*, 389 U. S. 155, 156–157 (1967); *Texas Boundary Case*, 394 U. S. 1, 2 (1969); *United States* v. *Maine*, 420 U. S. 515, 524–526 (1975); *United States* v. *Louisiana*, 446 U. S. 253, 256, 268 (1980).

replaced with a rule awarding title to the owner of the land on which the accretions took place. To accept this submission, however, would require rejecting not only *Hughes*, but also the long-established federal rule that accretions belong to the upland owner—a doctrine consistent with the majority rule prevailing in the States. See Part III, *supra*. Indeed, the proposed rule is also inconsistent with California's own law that accretions attributable to natural causes belong to the upland owner. For all these reasons, we refuse the invitation to depart from the long-settled rule.[14]

Independent of the above analysis, California claims that the United States expressly surrendered title to the disputed land through the Submerged Lands Act. California argues the subject land falls within the general grant to the States of "lands beneath navigable waters." Section 2(a)(3) of the Act defines "lands beneath navigable waters" to include "all filled in, made, or reclaimed lands which formerly were lands beneath navigable waters." 43 U. S. C. § 1301(a)(3). Because the jetty construction caused fairly rapid accretion, and, but for the construction of the jetties, the subject land would have remained submerged, California submits the accretion-formed land is "made" land, whose title rests in California by virtue of the Submerged Lands Act.

---

[14] For the same reasons, we reject California's alternative theory that the equal-footing doctrine vests title in the State to all lands that ever were tidelands. California argues that as deposition occurred on submerged land, these areas went to a tideland phase—vesting title in the State—before eventually emerging as uplands. Federal law governs the scope of title initially vested by the equal-footing doctrine; at most, this argument suggests a different federal rule should apply to former tidelands. The suggestion has little to recommend it. Even leaving aside the concerns expressed in text, we see no reason for an exceptional rule to apply to land that once was, but no longer is, tideland. Moreover, implementation of the rule would require plotting the high- and low-water lines at all intervening times between statehood and the present.

We do not read this provision of the Act as applying to the gradual process by which sand accumulated along the shore, although caused by a jetty affecting the action of the sea.[15] Moreover, to the extent that the accretions are to be considered "made" land, they would fall within the reservation by the United States of "all lands filled in, built up, or otherwise reclaimed by the United States for its own use." This follows from the congressional object to assure each sovereign the continuing benefit of landfill and like work performed by each.[16] In any event, § 5(a) of the Act expressly withholds from the grant to the States all "accretions" to lands reserved by the United States, and both California and the United States agree that the exposure of the formerly submerged lands in dispute constitutes "accretion." This reading of the Act adheres to the principle that federal grants are to be construed strictly in favor of the United States. *United States* v. *Grand River Dam Authority,* 363 U. S. 229, 235 (1960);

---

[15] The word "made" was inserted into the provision in a bill introduced by Congressman Walter. H. R. 8137, 81st Cong., 2d Sess., § 2(a)(2) (1950). The Report on that measure describes it as "in substance, the same" as earlier proposals omitting the term. H. R. Rep. No. 2078, 81st Cong., 2d Sess., 3 (1950). Throughout Congress' consideration of the bill there was no comment on the "made" land provision. No Member of either House ever suggested that § 1301(a)(3) covered accretions that were attributable to artificial works. Against this background, we find no significance in the two casual references by Robert Moses and Senator Daniel to naturally formed accretions as "made." Hearings on S. J. Res. 13 et al. before the Senate Committee on Interior and Insular Affairs, 83d Cong., 1st Sess., 158 (1953) (remarks of Robert Moses); *id.,* at 193–194 (remarks of Sen. Daniel).

[16] The interpretive opinion rendered by former Solicitor General Cox, while including naturally formed islands within the "made" language of § 2(a)(3), rejects the suggestion that accretion to the mainland, whether or not directly attributable to artificial causes, is included in the Submerged Lands Act grant to the States. 42 Op. Atty. Gen., at 259–265, 266–267. We express no opinion on the Act's treatment of naturally formed islands in the marginal sea.

*United States* v. *Union Pacific R. Co.*, 353 U. S. 112, 116 (1957).

Finally, California submits that the Act granted title to the State by confirming the title of persons who, on June 5, 1950, were entitled to such lands "under the law of the respective States in which the land is located . . . ." 43 U. S. C. § 1311(a). This provision means nothing more than that state law determines the proper beneficiary of the grant of land under the Act; it is clear that federal law determines the scope of the grant under the Act in the first instance.

## V

We reaffirm today that federal law determines the boundary of oceanfront lands owned or patented by the United States. Applying the federal rule that accretions of whatever cause belong to the upland owner, we find that title to the disputed parcel rests with the United States. Accordingly, California's motion for summary judgment is denied, and the United States' motion for judgment on the pleadings is granted. The parties, or either of them, may, before September 27, 1982, submit a proposed decree to carry this opinion into effect, failing which the Court will prepare and enter an appropriate decree at the next Term of Court.

*It is so ordered.*

JUSTICE REHNQUIST, with whom JUSTICE STEVENS and JUSTICE O'CONNOR join, concurring in the judgment.

I concur in the judgment. I believe that our decision in *Wilson* v. *Omaha Indian Tribe*, 442 U. S. 653 (1979), requires the application of federal common law to resolve this title dispute between the United States and California, and that § 5(a) of the Submerged Lands Act indicates the source of that law.

The dispute in this case concerns the ownership of artificially caused accretions on oceanfront property belonging to

the United States. The dispute centers on the legal effect of the movement of the "mean high-water mark." That mark separates the fastlands continuously owned by the United States from the "tidelands"—the area of partially submerged lands between the mean high- and low-water marks. California's claim of title to the tidelands is based upon the equal-footing doctrine. Because the tidelands belong to it and because the accretions formed on the tidelands, California contends that state law applies to resolve this title dispute between it and the United States. The rule adopted by the California courts regarding artificially caused accretions holds that title to accreted land vests with the State rather than the riparian or littoral owner. The United States contends that federal common law applies and argues that the federal common-law rule holds that title to land formed by accretion vests in the owner of the riparian land.

The dispute in this case is similar to that in *Wilson* v. *Omaha Indian Tribe*. We held in *Wilson* that federal common law and not state law governs title disputes resulting from changes in the course of a navigable stream where an instrumentality of the Federal Government is the riparian owner. 442 U. S., at 669–671. The rule of *Oregon ex rel. State Land Board* v. *Corvallis Sand & Gravel Co.*, 429 U. S. 363 (1977), was distinguished. The *Corvallis* rule—that state law governs—applies where the dispute over the legal effect of a shifting riverbed does not involve claims of title by a federal instrumentality.

I agree with the Court that the *Wilson* rule applies to oceanfront property as well as riverfront property where the Federal Government is the littoral owner. *Wilson* should apply to the movement of the high-water mark along the ocean in a fashion similar to the way it applies to changes in the bed of a navigable stream. In the instant case, as in *Wilson*, it is irrelevant that the accretion, as a geographical "fact," formed on land within the State's dominion, be it a river bottom or the ocean tidelands. The fact is that both

*Wilson* and the instant case concern title disputes over changes in the shoreline where the Federal Government owns land along the shoreline.

In *Wilson*, we held that state law supplied the applicable rule of decision even though federal common law applied to resolve the title dispute. We found no need for a uniform national rule and no reason why federal interests should not be treated under the same rules of property that would apply to private persons. In contrast to *Wilson*, however, I agree with the Court that Congress in § 5(a) of the Submerged Lands Act has supplied the rule of decision. Section 5(a) withholds from the grant to the States all accretions to coastal lands acquired or reserved by the United States. I also agree with the Court that California did not acquire the disputed lands pursuant to the "made lands" provisions in § 2(a)(3).

Consequently, the Court's discussion regarding the continuing vitality of *Hughes* v. *Washington*, 389 U. S. 290 (1967), is dicta. *Hughes* is unnecessary to the resolution of choice-of-law issues in title disputes between the Federal Government and a State or private person. Reliance on *Hughes* would be necessary only if we were to hold that federal common law, rather than state law, applied in a title dispute between a federal patentee and a State or private persons as to lands fronting an ocean. The instant case does not present that issue. It is difficult to reconcile *Hughes* with *Corvallis* and we should postpone that endeavor until required to undertake it.

In summary, I think this case can be easily resolved as a title dispute between the United States and California concerning the legal effect of movement of the Pacific Ocean's high-water mark. *Wilson* and the Submerged Lands Act resolve the dispute. The continuing vitality of *Hughes* should be left to another day.