STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 03-241

RICELAND PETROLEUM COMPANY

VERSUS

NORTH AMERICAN LAND COMPANY, INC., STREAM FAMILY LIMITED
PARTNERSHIP, ET ALS, AND THE STATE MINERAL BOARD OF THE
STATE OF LOUISIANA

**********
APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, NO. 10-15672
HONORABLE H. WARD FONTENOT, DISTRICT JUDGE
**********

ARTHUR J. PLANCHARD
JUDGE PRO TEMPORE

**********

Court composed of Billie Colombaro Woodard, and Jimmie C. Peters, Judges and
Arthur J. Planchard, Judge Pro Tempore.

REVERSED AND RENDERED

William E. Shaddock
William Boyce Monk
P. O. Box 2900
Lake Charles, LA 70602
Counsel for: Defendant-Appellant
     State Mineral Board of the State of Louisiana

A. J. Gray, III
P. O. Box 1467
Lake Charles, LA 70602-1467
Counsel for: Defendant-Appellee
     North American Land Co., Inc. and Matilda Gray Stream

Randall Charles Songy
102 Versailles Blvd, Suite 600
Lafayette, LA 70502-3507
Counsel for: Defendant-Appellee
     North American Land Co., Inc. and Matilda Gray Stream

**John M. McCollam**
**201 St. Charles St. Suite 4000**
**New Orleans, LA 70130-4000**
**Counsel for: Plaintiff-Appellee**
  **Riceland Petroleum Company**

PLANCHARD, Judge

This matter came before the district court as a concursus filed by Riceland Petroleum Company to determine the ownership of royalties owed under mineral leases affecting land within two conservation units. The ownership of that land is disputed. Under Louisiana law title to property can be decided in a concursus proceeding. The contest in this case is between a group of private parties and the State of Louisiana. The private parties are the North American Land Company, Inc.; Mathilda Gray Stream; Stream Family Limited Partnership; HHS Naked Ownership Trust; SGSL Naked Ownership Trust; WGS Naked Ownership Trust; Harold Stream Investment Trust; Sandra Stream Investment Trust; and Gray Stream Investment Trust. The State of Louisiana appears through the State Mineral Board. In this opinion we will refer to the private parties collectively as North American-Stream, and to the State of Louisiana as the State.

The disputed property is located in Cameron Parish along the shore of the Gulf of Mexico about seven miles east of Sabine Pass, the border between Louisiana and Texas. It is an undeveloped part of the physical environment known as the Chenier Plain. According to the experts, the coast there has enjoyed an irregular but net accretion over the last two centuries, though at declining rates, the decline becoming more rapid since the middle of the 20th century. The disputed property is the accretion. The north boundary of the disputed property is the southern boundary of Township 15 South, Range 14 West (T15S, R14W), Cameron Parish, Louisiana, as laid out in the field survey of Thomas Bilbo, a United States Deputy Surveyor, in 1838 and retraced in 1999 by a survey of Michael P. Mayeux, a Registered Louisiana Surveyor. The south boundary of the disputed property is the seashore of the Gulf of

Mexico. The focus of the dispute is the several hundred feet of accreted property between fractional Section 23 of the township and the present shoreline of the Gulf.

There is no dispute that North American-Stream is the present owner of platted Sec. 23, T15S, R14W. There can be no dispute that the State owns the seashore (herein sometimes tidelands, sometimes shore lands) south of it. The trial court held that the owner of the several hundred feet of accretion that lies in between is North American-Stream. In effect, the trial court reasoned that because the plat of survey by which the State acquired Section 23 in the year 1850 from the United States showed a meander line along the coast as the southern boundary of the section, the coast necessarily became the ambulatory southern boundary for all time, and the owner of Section 23 will always own to the water's edge. In so ruling, the trial court held that Louisiana Civil Code Article 500, which provides that there is no right to alluvion or dereliction on the shore of the sea or of lakes, and Louisiana case law which holds that the State owns accretion on the seashore, must give way to controlling federal law as announced in *Hughes v. State of Washington*, 389 U.S. 290, 88 S.Ct. 438 (1967). That case held that coastal boundary questions where accretions had extended the shoreline seaward are resolved by applying the federal common law rule which gives the right to the accretions to the federal grantee.

The State appeals. For reasons which we will now explain, we reverse and render judgment in favor of the State of Louisiana recognizing the State as the owner of the disputed property. We find that *Hughes* does not apply to this case.

The issues in this case revolve around two ancient conveyances of Section 23. The first conveyance was a grant from the United States to Louisiana by means of the Swamp Lands Acts of Congress of 1849 and 1850. The second was a sale by the State to Jabez B. Watkins in the year 1883. The extent of the title passed by these two

conveyances are important questions that must be examined to determine the ultimate issue of ownership of the accretion today.

The history of Section 23 began in 1838 when Thomas Bilbo, a United States Surveyor, mapped T15S, R14W, Southwestern Land District (now part of Cameron Parish) on the ground. The 1838 Bilbo Survey was the official United States General Land Office survey which actually created the township and its sections and from which the Official Township Plat was made.

THE SWAMP LANDS ACQUISITION

In 1849 and 1850, Congress adopted the Swamp Lands Acts which granted to Louisiana swamp and overflowed lands for the purpose of aiding in the reclamation of those lands. The Acts required that before title could pass to the State there had to be a survey done under authority of the United States and a selection of lands by the State. The Bilbo Survey of the township related to where our disputed property lies, had already been done in 1838. By that survey the township and section corners were established, and the township and section lines were run, except that the north-south lines on some of the bottom sections were run only to the margin of the Gulf. The contour of the Gulf, relatively straight at this point, was meandered on the survey. From Bilbo's field notes and sketch came the plat. This plat became the official plat of the survey of the lands on file in the Louisiana State Land Office.

Because of the Gulf this township was a fractional township and Section 23 was a fractional section. According to the Official Township Plat it contained just 38 acres. This was not just the upland, but all the land in the section. It was not called a fractional section but the area given, 38 acres, in comparison with the 640 acres in a regular section, shows that Section 23 was in fact a fractional section. *State v. Aucoin,* 20 So.2d 136, 206 La. 787 (1944). Along with other sections in the township,

fractional Section 23 was selected by the State under the Swamp Lands Act on December 7, 1850. Title became vested in the State at that time. The State Tract Book records, which are the official records reflecting this selection and approval, show in the "remarks" column of acres beside Section 23 the number 38, reflecting the acreage of the section on the Township Plat.

The trial judge decided, and we agree, that according to the Bilbo Survey, Section 23 bordered the Gulf when the section was created. The title conveyed to the State therefore extended to the seashore. Louisiana Civil Code Article 451 defines "seashore" as "the space of land over which the waters of the sea spread in the highest tide during the winter season."

No one knows whether, between 1838 when the Bilbo survey was done and 1850 when the swamp land that included Section 23 was selected by the State, the shoreline moved in, or out, or not at all. There is in the record no evidence on which a reliable determination can be made of what actually happened in that remote and short twelve year span. There is evidence in the record showing where the shoreline was in 1838 and 1883, and we know where it is now, but no evidence was offered to establish specifically where it was in 1850. On the record before us the best evidence of where the southern boundary of Section 23 was in 1850 is where it was in 1838. All of the evidence makes it appear that Bilbo tried to establish the southern boundary of the township by a meander of the sinuosities of the high water line of the coast. For example, at one place in his field notes he indicated he was at a point where the marsh joined the Gulf of Mexico. For this reason we regard the bottom boundary of Section 23 and the shoreline of the Gulf as coterminous on the Bilbo survey, just as the trial court decided. We accordingly establish the shoreline in 1850 at the time of the State's acquisition of Section 23 as being exactly where it appears on the Official Township Plat.

-4-

In 1999, Michael P. Mayeux, a Registered Professional Land Surveyor, using Bilbo's field notes and sketch, retraced and re-monumented this traverse, or meander line on the ground. There is no dispute as to the accuracy of his retracement and re-monumentation. Mayeux retraced Bilbo in accordance with the procedure approved in *Aucoin*, 20 So. 2d 136. He retraced the Bilbo original traverse across the entire township. He reestablished the southeast corner of the township from the original General Land Office field notes of Bilbo on the Gulf coast, and from there he did his retracement and reestablishment of the Bilbo monuments on the ground. Mayeux testified that the 1838 meander line of the shore was not a typical meander line, explaining that Bilbo had established not only section corner posts but also quarter section corners. The field notes of Bilbo's survey reflecting these intermediate monuments along the meander traverse were followed and re-monumented. The retraced and re-monumented traverse shows where the southern or bottom section line of Section 23 was in 1838 and where it is today.

The trial judge found that the meander line of the Bilbo survey was not there to fix the southern boundary "but simply to reflect the sinuosity of the coastline which continued to be the point of high tide of the Gulf of Mexico." We agree with the trial judge that when the line was established it was placed as close as possible to the point of high tide of the Gulf in 1838, but we cannot agree that it did not fix the southern boundary. The extent and validity of a federal grant is a question to be resolved by federal law. *Borax, Consolidated, Ltd., v. Los Angeles*, 296 U.S. 10, 56 F.2d 23 (1935). What exactly was conveyed to the State is a federal question. *Chapman & Dewey Lumber Co. v. St. Francis Levee Dist.*, 232 U.S. 186, 34 S.Ct. 297 (1913). "[I]t is a familiar rule that where lands are patented according to such a plat, the notes, lines, landmarks, and other particulars appearing thereon become as much a part of the

patent, and are as much to be considered in determining what it was intended to include, as if they were set forth in the patent." *Id.* at 187, S.Ct. at 29.

The court in *Producers Oil Co. v. Hanzen*, 238 U.S. 325, 35 S.Ct. 755 (1915), after citing numerous of its decisions including *Hardin v. Jordan*, 140 U.S. 371, 11 S.Ct. 808 (1891), stated the principle that "facts and circumstances may be examined, and if they affirmatively disclose an intention to limit the grant to actual traverse lines, these must be treated as definite boundaries." It is clear from the circumstances that in 1850 the United States did not intend to convey any property beyond the meander line. This is clear for a number of reasons: the section ended there; the section contained a calculated 38 acres which was paid for; the official plat showed that both the township and the section terminated as shown by where the traverse existed; and the State by virtue of its sovereignty was the recognized owner of the tidelands that lay immediately adjacent to the platted section and township. When it is clear from the circumstances that the government did not intend to convey any property beyond the meander line, the meander line is the boundary. *Ritter v. Morton*, 513 F.2d 942 (9th Cir., 1975), *cert. denied,* 423 U.S. 947, 96 S.Ct. 362. The factual circumstances to be reviewed in determining whether a meander line was intended as the boundary include the precise description of the land contained in the surveyor's field notes and the official plat. *Id.* Great weight must be given to the boundary line as revealed in the survey and as shown on the plat. *Id.* Also, particular attention must be paid to the precise acreage computation in the plat. *Id.* The case of *Lee Wilson & Co. v. United States*, 245 U.S. 24, 38 S.C. 21 (1917) states this legal proposition:

> Where in a survey of the public domain a body of water or lake is found to exist and is meandered, the result of such meander is to exclude the area from the survey and to cause it as thus separated to become subject to the riparian rights of the respective owners abutting on the meander line in accordance with the property laws of the several states.

What the State received in the grant was Section 23 as shown on the survey.

North American-Stream relies on *Jefferis v. East Omaha Land Co.*, 134 U.S. 178, 10 S.Ct. 518 (1890) for the rule that when a water line is the boundary of a governmental subdivision, it always remains the boundary and the accretion becomes part of the subdivision. The facts of that case clearly distinguish it from ours. In that case the land was a subdivision, or lot, inside the township, and the Missouri River was a boundary of that lot. "No provision was made for running the north boundary line of lot 4, but the river formed such north boundary without the running of any line there." *Id*, 134 U.S. at 182, 10 S.Ct. at 522. In our present case, there was a surveyed line that formed the south boundary. That line was not merely the boundary of the property conveyed; it was also the boundary of the surveyed section and township.

The same considerations are recognized in Louisiana case law to determine whether a meander line is a boundary. The meander line in this case is more than a simple traverse. It also represents a surveyed section and township line marking the southern boundary of Section 23 and the southern boundary of the township at that point. A section corner or quarter corner that is identified as having been established by an official survey of the United States government must stand as being correctly located, because government surveys cannot be changed in an action at law between individuals. *Houston Ice & Brewing Co. V. Murray Oil Co.*, 149 La. 228, 88 So. 802 (1921). In *Aucoin*, 20 So.2d 136, the traverse of Lake Long on the official plat of the government survey was recognized by the Surveyor General of Louisiana and the Commissioner of the General Land Office because the State owned Lake Long, a navigable lake, by virtue of her sovereignty. "When lands have been disposed of by the government according to a line appearing on an official plat of a government survey, approved by the Surveyor General, the location of the line shown on the official plat is controlling." *Id*. at 154.

We have demonstrated that the southern boundary of Section 23 and the coastline were originally one and the same. Our reference to "originally" means when Section 23 was created. When the State acquired Section 23 it already owned the shorelands by virtue of its sovereignty, having acquired that title in the year of its statehood, 1812, as the beneficiary of the equal footing doctrine. Thus, in 1850 it became the owner of Section 23 as well as the shorelands on which the section bordered. Ownership of what theretofore had been two separately identifiable areas, the platted Section 23 and the seashore, was now vested in one owner, the State of Louisiana.

Under Louisiana law, whether an owner of land bordering on water may acquire additional land or lose what he has, by effect of a change in the location of the shoreline of the water, are matters governed by the Civil Code. Accretion, which the Code calls alluvion, formed successively and imperceptibly on the bank of a river or stream, belongs to the owner of the bank. La. Civ.Code art. 499. However, there is no right to alluvion or dereliction on the shore of the sea or of lakes. La. Civ. Code art. 500. Accretion does not become the property of owners of soil contiguous to the seashore. *Zeller v. Southern Yacht Club*, 34 La. Ann. 837 (1882). As the trial judge observed, this has been the law of Louisiana since statehood. In fact, it was part of the Digest, or Code, of 1808, four years before Louisiana became a state. Thus, State law does not recognize and never has recognized a private right to accretion on the seashore. Such accretion belongs to the State. *Davis Oil Co. v. Citrus Land Co.*, 576 So. 2d 495 (La. 1990).

In *Oregon ex. Rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S.363, 376, 97 S.Ct. 582, 590 (1977) the court quoted the following principle from its own earlier decision in *Wilcox v. Jackson*, 38 U.S. (13 Pet.) 498, 517(1839):

We hold the true principle to be this, that whenever the question in any Court, state or federal, is, *whether* a title to land which had once been the property of the United States has passed, that question must be resolved by the laws of the United States; but that *whenever*, according to those laws, *the title shall have passed*, then that property, like all other property in the state, is *subject to state legislation*; so far as that legislation is consistent with the admission that the title passed and vested according to the laws of the United States. (Emphasis by the court.)

We hold that when Louisiana acquired Section 23 via the Swamp Lands Acts it acquired a platted section of land with a definite, fixed boundary on the south. Moreover, when title passed to the State in 1850 there is no question that Section 23 was at the same time riparian. Under federal law the right to future accretion is an inherent and essential attribute of the littoral or riparian owner. *California v. United States*, 457 U.S. 273, 102 S.Ct. 2431 (1982). When title to Section 23 passed to the State from the United States, the federal common law riparian right to accretion became vested in the State as an attribute of the property. The State as the upland owner was entitled to the accretion because this was an attribute of title obtained by grant from the Government. *United States v. State of Washington*, 294 F.2d 830 (9th Cir., 1961), *cert. denied*, 369 U.S. 817, 82 S.Ct. 828. There was, at this time, no conflict between federal laws and Louisiana law with respect to the State's right to ownership of the accretion. The title to Section 23 had passed and vested according to the laws of the United States and the State was entitled to the accretion.

Applying the quoted principle from *Oregon*, 429 U.S. 363, 97 S.Ct. 582, when title passed from the United States the property, like all other property in the state, became subject to state legislation. That means that from 1850 on the property became subject to Louisiana's laws regarding ownership and alienation.

Thus, as to Section 23 the United States disposed of the full measure of its title in the Swamp Lands disposition to the State, and the full measure of its title included the riparian owner's right to the accretion. No Louisiana legislation could affect the

United States' power to make that disposition. The State as the grantee of the federal land acquired the right to future accretion, or alluvion. Under Louisiana law, too, the State, by virtue of its sovereign ownership of the seashore, possessed the sole proprietorial right to future alluvion. Regardless of whether the legal source of the ownership of the accretion was the authority of state law or federal law, the State became the owner of the accretion. The question thus becomes whether in 1883 it sold that accretion to Watkins. This question brings us to the second conveyance under consideration, the patent to Watkins in 1883.

THE STATE TO WATKINS 1883 CONVEYANCE

Act 75 of the 1880 Louisiana legislature was one of a series of acts re-affirming the authority of the Louisiana State Land Office to administer the sale of public lands donated to the State by Congress. In 1883, pursuant to the legislative authorization of Act 75, the State sold 2868 acres of land, which included Section 23, to Jabez B. Watkins. He is North American-Stream's ancestor in title. According to §1 of Act 75, the State Land Office was created "for the sale of public lands donated to the State by Congress," and §§ 10 and 11 made "the public lands, donated by Congress to the State of Louisiana . . . subject to entry and sale." Section 7 required that the State give the purchaser a receipt "which shall contain a correct description, by section, township and range, of the lands sold by the State." Pursuant to this authorization, on May 24, 1883, the State conveyed to Watkins 2868 acres out of T15S, R14W, described as parts of seven sections and all of seven more sections, including Section 23. The description of the property conveyed was "according to the official plat of the survey of said lands in the State Land Office," and "under the provisions of Sec. No. 11, Act No. 75, of 1880." The specific description of the property conveyed was:

> N/2 of NE/4, NW/4 of NW/4 Sec. 1, N/2 of NE/4, NE/4 of NW/4 Sec. 2, SW/4 of SE/4, S/2 of SW/4, Sec. 6, NW/4 of NE/4, N/2 of NW/4, Sec.7, S/2 of S/2 Sec. 14, S/2 of S/2 of Sec. 17, S/2 of S/2 of Sec. 18,

CHECK THIS [sic] All of Sec's. 19,20,22,21,23,29 and Sec. No 30, Township No.15 S, Range No.14 W., in the Southwestern Land District, containing 2868 acres, according to the official plat of the survey of said lands in the State Land Office.

The patent itself, dated May 24, 1883, erroneously described the acreage as 2860 instead of 2868, but the price at 12-1/2 cents an acre, $358.50, was correctly stated. The receipt issued in compliance with Act 75 correctly stated both the acreage and the price. It is clear that when the State sold Section 23 to Watkins in 1883, it sold portions of the same property, including all of fractional Section 23, that it had acquired from the United States under the Swamp Lands grants in 1849 and 1850. The land was conveyed according to the official Plat of Survey in the State Land Office, which was the government survey by Thomas Bilbo in 1838. In formulating Act 75 of 1880 the State exercised extreme caution in providing that the lands it authorized to be sold were only those received by the State under the Swamp Land Acts of 1849 and 1850. *Gulf Oil Corp. v. State Mineral Bd.*, 317 So.2d 576 (La. 1974); John L. Madden, **Federal and State Lands in Louisiana**, 331 (1973)

The trial court ruling that the seashore of the Gulf of Mexico as it stood at the time of the passing of title to Watkins in 1883 constituted the southern boundary of Section 23 was in reliance on *Stamper v. Bienville Parish Police Jury*, 153 So.2d 503 (La. App. 2d Cir.1963). The *Stamper* case was a title dispute over 2.53 acres, the competing claimants both tracing their titles to the United States, one in accordance with a surveyed contour line of the water's edge of Lake Bisteneau, and the other in accordance with a surveyed traverse, or meander line. The *Stamper* court held that under the facts of the case the contour line and not the traverse line was the boundary. Relying on this authority the trial court in the instant case ruled that the meander line shown on the Bilbo Survey was not the southern boundary of the township and of

-11-

Section 23, but that the water was, and concluded that the southern boundary of Section 23 in 1883 was the Gulf of Mexico.

Reliance on *Stamper* was misplaced. In *Stamper* there were two surveyed lines and the court was called upon merely to choose which more accurately reflected the intent of the original grant. In our present case there is only one surveyed line and it was put there not only as a meander but also as the boundary of the township and the section. Under Louisiana law to which the property became subject after the Swamp Lands Acts grant, what was conveyed to Watkins was the surveyed Section 23 that had been granted to the State by the United States in 1850.

We repeat that the State in 1850 became the full owner of Section 23 as well as the shore lands on which the section bordered. In the case of *Rodrigue v. Rodrigue*, 218 F.3d 432 (5ᵗʰ Cir. 2000), *cert. denied,* 121 S.Ct. 1227, 532 U.S. 905 (2001), the court, discussing Louisiana Civil Code provisions regarding Louisiana's property law, said it well:

> In the Civil Law the bundle of rights that together constitutes full ownership of property comprises three separate sub-bundles: (1) *usus*–the right to use or possess, i.e., hold, occupy, and utilize the property; (2) *abusus*–the right to abuse or alienate, i.e. the right to transfer, lease, and encumber the property, and (3) *fructus*–the right to the fruits, i.e., the right to receive and enjoy the earnings, profits, rents, and revenues produced by or derived from the property.

When the ownership of the shore and the land abutting the shore became united in the State, the whole bundle of rights to the shore and Section 23 became united in one owner. The riparian rights became an element of ownership, part of the *fructus*, and were united with the bundle of rights that gave the State full ownership of the seashore, Section 23, and all accretion in between.

With full ownership came the element of *abusus* and the right to alienate the land. La. Civ.Code art. 477. This meant also the right to alienate any part of what it owned there except the seashore which, under Civil Code article 450, is inalienable.

-12-

The authority to alienate a part of the land means the State could have sold Watkins all of Section 23 or any conceivable portion of it, just as it sold portions of seven other sections in that same patent to Watkins. It was empowered to sell all of Section 23 as it appeared on the plat of survey. Under Louisiana law "all of Section 23" did not include the riparian right of accretion. The State was not empowered by any legislation to sell the accretion between the southern border of the section and the sea. It was empowered to sell only what appeared on the plat of survey. It made this sale not only by specific description, but also in accordance with the limiting authority of the applicable legislation which we have discussed above. When this sale was confected the parties must be presumed to have acted with knowledge of the provisions of Louisiana law dealing with ownership of immovables.

WHO OWNS THE ACCRETION?

It is apparent that our opinion is the State owns the accretion, the disputed property. However, we must deal with *Hughes*, 389 U.S. 290, 88 S.Ct. 438.

In that case Mrs. Hughes, who owned oceanfront property that had been patented to her predecessor in title by the United States prior to the entry of the State of Washington into the Union, asserted title to the accretions as her federal common law riparian right. The State of Washington claimed the accretions that accumulated after its statehood by authority of its laws which gave accretion (called accretions in federal law) to the state as owner of the tidelands. The United States Supreme Court held that federal law applied and that under federal law, the federal grantee of the uplands had the right to the accumulated accretions. The court justified the employment of federal law because of the special nature of the coastal boundary question: "The rule deals with waters that lap both the lands of the State and the boundaries of the international sea. This relationship, at this particular point of the marginal sea, is too close to the vital interest of the Nation in its own boundaries to

-13-

allow it to be governed by any law but the 'supreme Law of the Land.'" *Id.*, at 293, 88 S.Ct.at 440. This was the principle of federal law that required that state law be displaced.

That principle is not present in this case. When Louisiana, as the federal grantee under the Swamp Lands Acts, acquired the right to the accretion that might attach to Section 23, it was the full owner of not only the tidelands, but also Section 23 and the accretion that might form in between. Its ownership of the federal riparian right was fully implemented. The title passed and vested in the State according to the laws of the United States. Thereafter, the title having passed, the property became subject to state legislation. The State could never sell the seashore because of its inalienability under state law. It could have sold Section 23 or any part of it and it could have sold the accretion or any part of it. We have been cited to no principle of federal law that would deny Mrs. Hughes in Washington or the State of Louisiana the right to divide riparian property and sell a non-riparian portion of it. The State in this case did not sell the accretion. It sold all of Section 23 in accordance with the official plat of survey.

There is enough evidence in this case to demonstrate that by 1883 when the State sold Watkins Section 23, the seaward movement of the shoreline had left the platted section high and dry. The State in its dual capacities as a sovereign and an original patentee of the United States, owned the place where water lapped both its lands and the boundaries of the international sea. The southern boundary of what it sold was no longer a coastal boundary, and this is what distinguishes our case from the application of the federal rule of *Hughes*.

THE 1912 STATUE OF REPOSE

We come now to one final issue. The trial judge held that, in any event, Act 62 of 1912 (La. R.S. 9:5661) afforded the state and private parties only six years to

challenge patents conveying state lands, and that the State is now precluded from questioning the patent's validity. This ruling, too, was error. The 1912 Statute of Repose applies by its terms only to suits to vacate and annul any patent issued by the State. By its enactment the legislature intended to do no more than cure formal defects in patents that were essentially valid, in that they conveyed alienable property. *Gulf Oil Corp. v. State Mineral Bd.*, 317 So.2d 576 ( La. 1974). In the present case the State does not contend that there is any defect in the title it issued in 1883 to the ancestor in title of North American-Stream. The dispute here is not as to title; the dispute is as to what was conveyed, which is a matter of interpretation of the instrument of conveyance. The State's assertions would effectuate the patent, not annul it; the State seeks to carry out the mutual intention of the parties as to the description of the area patented. This has been done before without violence to Act 62 of 1912. See, e.g., *Carter v. Moore*, 248 So.2d 813 (La. 1971) and *Aucoin*, 20 So.2d 136. If the statute applies at all, it applies to prohibit North American-Stream from seeking to now expand its title to include property not described and not intended to be conveyed to its ancestor by means of the 1883 patent.

JUDGMENT

For the foregoing reasons we reverse the trial court's ruling that the southern boundary of Section 23, Township 15 South, Range 14 West, in Cameron Parish, Louisiana, is the present location of the highest tide of the Gulf of Mexico in the winter season. We reverse the trial court's finding that North American-Stream are the owners of the property in dispute and all the minerals, as well as its award of all royalties to North American-Stream attributable to Tracts 3A, 3B, and Tract 4 on the unit survey for the PLAN 8 RB SU A.

Judgment is rendered decreeing that North American-Stream's ownership is defined on the south by the southern boundary of Section 23 in the year 1850, the best

-15-

evidence of which is the 1999 retraced and re-monumented survey by Michael P. Mayeau, Land Surveyor, of the 1838 Thomas Bilbo Survey.

Judgment is rendered decreeing that the State of Louisiana owns the property south of the southern boundary of Section 23, to the extent relevant to these proceedings, which boundary is described as follows:

> Legal Description of the 1838 Bilbo Meander Line
> of the shore of the Gulf of Mexico
> in Section 23, Township 15 South, Range 14 West
> Across the PLAN 8 RB SUA
> Established by Office of Conservation's Order No. 466- R-1
>
> Beginning at the intersection point of the West boundary of PLAN 8 RB SUA established by the Office of Conservation's Order Number 446-R-l and the South boundary of Section 23, Township 15 South, Range 14 West as established in 1838 by Thomas Bilbo, deputy surveyor. Said point of beginning also being located N 17°06'10" East a distance of 49.06' from the common point between course numbers 8 and 9 as shown on the plat of survey dated January 14, 2000 prepared by C.H. Fenstermaker & Associates, Inc. attached to said Order Number 446-R-l.
>
> Thence from said point of beginning North 85°30'40" East along the South boundary of said Section 23 a distance of 1,778.27' to a 1 1/4" galvanized pipe marking the South 1/4 corner of Section 23;
>
> Thence continuing North 85°30'25" East along the South boundary of said Section 23 a distance of 763.92' to the East boundary of said PLAN 8 RB SUA and the terminus point of that portion of the South boundary of said Section 23 as it crosses the PLAN 8 RB SUA unit. Said terminus point also being located North 01°01'39" West a distance of 222.60' from the common point between course numbers 20 and 21 shown on the thereto above referenced order.
>
> All bearings are based on the Louisiana Coordinates System of 1983 (93 adj.) South Zone.

It is ordered that Iberia Bank , New Iberia, Louisiana, pay all funds from the escrow account "Riceland Petroleum Company-State Lease 16037 No. 1 Well

Account," Account No. 2332000255, less costs of the trial below, to the State of Louisiana.

It is further ordered that Riceland Petroleum Company pay all royalties and other mineral revenues from the Riceland Petroleum Company-State Lease 16037 No. 1 Well which are attributable to Tracts 3A, 3B and 4 of the Compulsory Unit.

It is further ordered that costs of the trial be paid in accordance with the orders of the trial court, and costs on appeal will be paid by North American-Stream.

**REVERSED AND RENDERED.**