# ALEXANDER HAMILTON LIFE INSURANCE COMPANY OF AMERICA, Plaintiff

## v.

# GOVERNMENT OF THE VIRGIN ISLANDS OF THE UNITED STATES, Defendant

Civil No. 82/5

District Court of the Virgin Islands

Div. of St. Croix

October 19, 1983

WARREN B. COLE, ESQ., Christiansted, St. Croix, V.I., *for plaintiff*

RICHARD R. KNOEPFEL, ESQ., Assistant Attorney General (Department of Law), St. Thomas, V.I., *for defendant*

O'BRIEN, *Judge*

## MEMORANDUM OPINION AND JUDGMENT

This matter involves a disputed claim to valuable lands fronting on Salt River Bay in St. Croix. It was off this shore that Columbus

anchored nearly 500 years ago, upon discovering the island. His landing party was attacked by Carib Indians with fatal results, after which he beat a swift path to a more welcome environment.[1] While the issues in this lawsuit were passionately disputed, they are decided herein in a more genteel fashion. Title will be quieted in part to the plaintiff, and in part to the defendant.

## I. FACTS

The plaintiff is the successor in interest to a corporation which purchased hundreds of acres of land in Estate Judith's Fancy, St. Croix, in the 1950's. Much of the land was subdivided into individual housing plots, which were in turn sold off. There was extensive water frontage both on the sea to the north of Estate Judith's Fancy, and to the west where the property fronted on Salt River Bay. Plaintiff's predecessor in title began the process of development of an important part of its property, which was in the Salt River Bay area, during the late 1950's, the 1960's and into the early 1970's.

Included in this development was bulkheading to create a marina, thus enhancing the value of certain of the waterfront lots. Also included was construction out into Salt River Bay to create a jetty, and later, fast land, to protect the entrance to the waters of the marina. Additionally, work was done to improve the beach on Salt River Bay, and to create a small additional jetty to protect the beach from future erosion.

Much of this development work took place under the authority of the Army Corps of Engineers and the Department of the Interior of the United States. Some of the work was not authorized, such as artificially closing off a salt water pool area from the sea and one entrance to the marina. The net result of this was an increase in the land area fronting on Salt River Bay, and an obviously increased value to the property, both the upland portion and the fast lands thus created.

When the plaintiff obtained the property from its predecessor in interest, it confronted a claim by the defendant, Government of the Virgin Islands, in all lands which were formerly submerged lands underlying the Salt River Bay, which had become fast lands either

---

[1] Those of a historical bent are directed to Admiral Samuel Eliot Morrison's monumental The European Discovery of America, The Southern Voyages, Oxford University Press, 1974, pp. 110–112. On those pages, the November 14, 1493, discovery of St. Croix is recounted, with the final words: "Columbus did not care to tarry at St. Croix, lest the Caribs bring up reinforcements." Page 110 also carries a photo of the lands in dispute in this case, circa 1962.

by artificial means, or by natural accretion. It was the position of the defendant that the plaintiff, as upland owner, did not become the owner in fee simple of any property beyond the mean high water mark.

Rather, the government alleged, it was the owner of such lands by reason of the transfer to it of the rights of the United States in such submerged lands, in 1974, by 48 U.S.C. § 1705(a). There is no claim that the Virgin Islands had any right, title and interest to the submerged lands before 1974, except as derived from the transfer.

To settle the dispute, the plaintiff filed this action to quiet title. Eleven of the twelve counts sought to quiet title to property claimed by the plaintiff, and the twelfth count sought money damages for the plaintiff's claim that the defendant had adversely claimed title which impaired plaintiff's ability to market the property.

After a summary judgment motion was argued, the Court made certain findings concerning several of the counts, and judgment was entered as to them on November 23, 1982. A court trial was then held on the balance of the counts, and additional findings were made on additional counts. Judgment as to them was entered on July 13, 1983. Finally, oral argument was held both as to the facts and as to the law on the remaining counts. The Court made factual findings on the remaining counts on August 10, 1983, and now we make the conclusions of law and enter judgment which disposes of all the remaining issues between the parties.

As a discussion of each of the parcels of land takes place, here, additional facts are alluded to for the purpose of making the discussion understandable to persons who did not attend the trial or read the findings previously made. There are no facts discussed which are not part of the Findings of Fact entered on August 10, 1983, however.

## II. APPLICABLE LAW

It is crucial to a decision in this case to recall that the events which gave rise to the action to quiet title herein all occurred before 1974. Prior to 1974, the United States was the owner of the submerged lands surrounding the Virgin Islands. It was not until passage of 48 U.S.C. § 1705 et seq. in 1974, that the Government of the Virgin Islands acquired any right formerly held by the United States in submerged and filled lands. And congress, in section 1705(a), made the transfer of the rights of the United States in these lands "subject to valid existing rights."

Clearly then, those rights of upland owners at the time of the

transfer were in effect, frozen in time. They would be determined on the basis of the then existing relationship between themselves, as upland owners, and the United States. Surely, under these circumstances, federal common law would apply, since no right of the Virgin Islands as a "state" or equivalent sovereign would come into play.

The rights of the parties would be determined as well, keeping in mind that the United States continued to reserve its navigational servitude under 48 U.S.C. § 1706(c).

The authority to convey any rights held by the United States in submerged and filled lands was, from November 20, 1963, until 1974, held by the Secretary of the Interior, under 48 U.S.C. § 1702. This section was repealed when those rights were conveyed to the territories by passage of section 1705.

## III. DISCUSSION

A. *Ownership of Plot 329*

The question which poses the most difficulty in this decision is: Who has title in fee simple to Plot No. 329 of Estate Judith's Fancy, more particularly described in P.W.D. Drawing No. 2826 dated June 11, 1970. This land, now comprising nearly three acres, first rose above the sea merely as a jetty extending about 750 feet into the water. The jetty was built by plaintiff's predecessor in title under authority of the Army Corps of Engineers Permit dated April 19, 1962. (Plaintiff's Exhibit 9.)

The jetty was expanded as fast land by a further permit dated February 19, 1964, authorizing the permittee to dredge and fill in the area which eventually became Plot 329. (Plaintiff's Exhibit 11.)

Then, on January 28, 1971, the U.S. Department of Interior issued a permit permitting construction of a breakwater atop the previously authorized jetty along the southern boundary of Plot 329. (Defendant's Exhibit G.) The permit authorized other work on other plots, which will be discussed later in this opinion.

The language of the three permits is not identical, and this becomes important to a determination of the issues in this case. The two Corps of Engineers permits expressly reserve to the United States the right to require removal of any improvements which were authorized "to render navigation reasonably free, easy and unobstructed." Thus, any rights acquired by the permittee would be subject to the rights of the United States with respect to navigational servitude.

The first two permits also had the following language printed at the top of the first page:

NOTE—It is to be understood that this instrument does not give any property rights either in real estate or material, or any exclusive privileges and that it does not authorize any injury to private property or invasion of private rights, or any infringement of Federal, State or local laws or regulations nor does it obviate the necessity of obtaining State assent to the work authorized. IT MERELY EXPRESSES THE ASSENT OF THE FEDERAL GOVERNMENT SO FAR AS CONCERNS THE PUBLIC RIGHTS OF NAVIGATION. (See Cummings v. Chicago, 188 U.S. 410.)

The third permit, that from the Department of the Interior, contains none of the language described above, but it does carry the following proviso;

7. IT IS EXPRESSLY UNDERSTOOD by the parties hereto that title to all land and/or other improvements on federally owned submerged lands resulting from filling and bulkheading, by the Permittee, is in the Federal Government, and the Permittee shall have no right or interest therein, of any kind whatsoever, other than such rights as are expressly set forth herein. It is further understood by the parties hereto that this instrument is not a lease.

Having proceeded to make the improvements authorized by the three permits, the plaintiff's predecessor in title observed Plot 329 gradually taking shape. It began as a jetty, and expanded over twelve years into its 1974 dimensions, from a combination of authorized fill, and natural accretion.

The question we must answer is: Who owns it under federal common law? The answer: the plaintiff owns the plot in fee simple, subject to the navigational servitude of the United States.

To state the answer so simply is not to overlook the tortuous route to be followed in arriving at that conclusion. Justice White, writing the majority opinion in California ex rel. State Lands Commission v. United States, 457 U.S. 273 (1981) states emphatically:

Applying the federal rule that accretions, regardless of cause, accrue to the upland owner, we conclude that title to the entire disputed land in issue is vested in the United States.

Id. at 285.

In the above case, the United States was the upland owner, in much the same position as the plaintiff in the case at issue. How-

338

ever, Justice White's opinion is not buttressed with citations to authority demonstrating that the federal common law is indeed so expansive. There is no dispute that natural accretions to land of an upland owner belong to that owner where there has been a gradual and natural accumulation of fast land over a long period of time. E.g. Bonelli Cattle Co. v. Arizona, 414 U.S. 313 (1973).

But the situation we face as to Plot 329 is that it began by artificial means permitted by law, and results from the combination of artificial means and natural accretion. Justice White's opinion, quoted above, suggests that the law is clear that the accretions, regardless of cause, belong to the upland owner.

Case history for this proposition, under federal common law, is sparse. However, a review of our meagre research resources has turned up a chain of cases that do support this statement of federal common law.

In Roberts v. Brooks, 78 F. 411 (2d Cir. 1897) it was held that where there was a legislative grant of authority to upland owners to build out from their land into a river, those owners became the owners in fee simple of the improvements and any accretions resulting from the improvements, and this ownership was vested without the necessity of a formal instrument under seal.

In the case at issue, permission to build the jetty is derived from the legislative grant of authority from Congress to the Army Corps of Engineers and the Secretary of the Army contained in 33 U.S.C. § 403. That legislative grant of authority gave the federal administrators the power to permit upland owners similar improvements as described in Roberts v. Brooks, *supra*.

Considering the grant of authority to plaintiff's predecessor in title to make improvements from the federal administrator having the congressionally-designated power to grant that authority, it follows the improvements when completed would expand the fee simple ownership of the upland owner to include the improvements and accretions.

This was certainly the explicit holding of one case which followed Roberts v. Brooks, supra, and another case from the Third Circuit which implicitly adopted the same viewpoint.

In United States v. Groen, 72 F.Supp. 713 (D.C.D.C. 1947), modified sub nom. United States v. Martin, 177 F.2d 733 (D.C. Cir. 1949), cert. den. 339 U.S. 957 (1950), the federal government had established a harbor line on the Anacostia River, a branch of the Potomac River in Washington, D.C. Waterfront landowners made improvements out into the water, but not to the harbor line. There was no

permit issued for each improvement, it appearing to be the law at that time that so long as there was not encroachment beyond the harbor line, a permit would not be required. The Court held that these owners enjoyed fee simple ownership of the improvements.

Curiously, Groen has never been cited for such a result, and remains ignored to this day. But its holding enjoys implicit support from the Third Circuit in United States v. Stoeco Homes, Inc., 498 F.2d 597 (3d Cir. 1974). There a private waterfront owner expanded his property by dredging and filling in Ocean City, N.J. Apparently the dredging and filling in took place in 1927 before a permit was required, and when it was the practice to require consent for encroachments only beyond pierhead or harbor lines.

Judge Gibbons, writing for the Court, treated the fast land so filled as owned in fee simple. He discussed this in the context of whether any navigational servitude was reserved to the federal government. He wrote

> If the administrative agency gives an express consent by permit in a specific instance, with no reservation of the right of complete removal, surely that consent must be considered to be a surrender of the federal servitude over the fee in question. (Emphasis added.)

Id. at 610.

■ The "fee in question" discussed by Judge Gibbons was the very land which had been dredged and filled by the waterfront owner under the consent of the federal government. By this holding, the Third Circuit implicitly accepted the proposition that where an upland owner makes an improvement consented to by lawful authority, he enjoys fee simple ownership of those improvements.

■ In the case at issue, applying the same reasoning, the plaintiff owns Plot 329, but subject to the federal government's navigational servitude. This was expressly reserved in the first two permits discussed earlier in this opinion, in contrast to the case decided by the Third Circuit.

All of this brings us back to California ex rel. State Lands Commission v. United States, supra, and Justice White's opinion for the majority. The case involved the United States as owner of the waterfront lands. The federal government built a jetty out into a bay leading to the Pacific Ocean. This resulted in fairly rapid accretion and formerly submerged lands became fast lands. Applying federal common law to the case, it was held that the waterfront owner, i.e.,

340

the United States, became the owner as well of the accretions. Except for the fact that the United States and not a private person owned the waterfront land and made the improvements, the fact situation parallels the instant case.

We concede that there were other factors at play in Justice White's majority opinion. Even taking them into account, however, there emerges a clear cut federal common law doctrine which favors the plaintiff herein as owner of Plot 329.

We are still faced with the Interior Department permit described earlier, which expressly ruled out ownership of any improvements in favor of the landowner. As this applies to Plot 329, there were two separate improvements allowed in that permit. One was the construction of a breakwater along the line of the jetty. The second was permission to construct another 130 foot breakwater out from the north side of the property. The breakwater built on the jetty did not result in additional land being created, but rather was atop the land already in existence. Therefore, the reservation would not apply as to this breakwater.

█ The second, smaller breakwater appears never to have been built. The map attached to the permit (Exhibit G) shows an existing 100 foot extension, to which the 130 foot breakwater was to be added. However, on P.W.D. Drawing No. 2826, the same area still only extends about 100 feet out from the main portion of the plot. If built, it too was placed atop existing land. Thus the reservation in the third permit would not apply to Plot 329, although it has significance to another plot, as we will see.

The final aspect of this matter is to determine the effect of the language in the first two permits which was quoted earlier. The two permits from the Army Corps of Engineers each expressly states that a permit "does not give any property rights either in real estate or material." Could this mean that the plaintiff does not have the right to fee simple ownership of Plot 329?

█ We do not follow the permit language to that conclusion. We agree with the reasoning of plaintiff's counsel who urged at oral argument that the language simply states that the issuance of a permit creates no property rights. It is the action taken pursuant to the permit that creates the rights, i.e., the reclamation, construction, dredging or filling, as the case may be, which creates property, or the condition for accretion, adjoining the lands of the upland owner. Put succinctly, it is the bringing to reality of what is permitted which creates the right.

Secondarily, the language can also be read to simply give effect to the passage by congress of the Submerged Lands Act, 67 Stat. 29, 43 U.S.C. 1301, et seq. This act was passed in 1953 and transferred the tidelands and submerged lands formerly owned by the United States to the various states. Thus, an Army Corps of Engineers permit issued after passage of that act could not infringe on the rights of the state to ownership of these lands. The language merely calls attention to that fact. The Act itself, or course, did not apply to the territories.

B. *Ownership of Plot 328*

Plot No. 328 of Estate Judith's Fancy, as more fully shown on P.W.D. Drawing No. 2826 dated June 11, 1970, is little more than a tenth of an acre jutting out from Plot 327. It was created under the permission granted by the Interior Department permit of January 28, 1971, in which there was an express provision that the improvement remained the property of the United States.

When the extension shown on the map attached to the permit is compared to Plot 328 as shown on P.W.D. Drawing No. 2826 dated June 11, 1970, it is clear that Plot 328 is solely in existence by reason of construction under the permit granted by the Department of the Interior. The permit, as stated, includes an agreement by the plaintiff's predecessor in title that no claim of ownership of such property so created would be made. Rather, any improvements would be the property of the United States.

■ For that reason, we hold that Plot 328 did not become the property of the plaintiff, but rather, it was included in the transfer by the federal government to the Virgin Islands Government in 48 U.S.C. § 1705(a), and is owned to this day by the Government of the Virgin Islands in trust for the people of the Virgin Islands.[2]

C. *Ownership of Plot 327*

By its Findings of Fact entered August 10, 1983, the Court found that Plot 327 was created by natural accretion to the shoreline, together with dredging and filling authorized by law, except that

---

[2] This is the Court's ruling notwithstanding the fact that Drawing No. 2826 is dated June 11, 1970, *before* the date of the permit, which is January 28, 1971. Drawing No. 2826 shows Plot No. 328 as "reclaimed land" and it is consistent with the reclamation proposed by the permit, even though the permit bears a date after the drawing. Whether Plot 328 was created before, or after, the official date of the permit is not important. What is important is that the permittee, plaintiff's predecessor in title, agreed that it would continue to be the property of the United States.

artificial fill was used to close off the pool area without authority. The federal common law earlier applied to Plot 329 would apply as to Plot 327, and ownership of that Plot is in the plaintiff with one exception.

■ Since unauthorized artificial fill was used to close off the pool area, the submerged lands under the pool are the property of the Government of the Virgin Islands, having been included in the transfer from the United States in 48 U.S.C. § 1705(a). Thus the pool area is not part of Plot 327, and the Government of the Virgin Islands, as owner of those submerged lands, has all the rights incident to ownership, which may include the right to obtain access to the sea closed off without permission. But that, at least, is for another case on another day.

D. *Ownership of the Marina*

■ The marina, open to the sea, is shown on both P.W.D. Drawing No. 2826 of June 11, 1970, and P.W.D. Drawing No. 3021 dated March 9, 1972. The Court, in its Findings of Fact dated August 10, 1983, found that the marina was never naturally closed off to the sea. The result of such a finding must be that the Government of the Virgin Islands is the owner of the submerged lands under the marina waters by reason of the transfer from the United States in 48 U.S.C. § 1705(a). Since the marina is presently open to the sea, the Government of the Virgin Islands has access to and from the marina, and control thereof.

E. *Adverse Claims to Title-Damages*

The plaintiff claims in Count XII of its amended complaint that the adverse claims by the defendant deprived it of the opportunity to market the property. It claims substantial money damages for that loss of opportunity. In proof of that deprivation, the plaintiff introduced into evidence contracts of sale for the entire property owned by the plaintiff. Those contracts of sale included property, such as Plot No. 328, the pool area of Plot No. 327, and the marina on which portions of Plots 326, 327 and 343 front. In each of these instances, title is to be quieted not in the plaintiff, but in the defendant.

■ Accordingly, in the Court's view, the defendant had a legitimate claim of title which would have been substantial in the face of attempts to market all of the property which has been the subject of this lawsuit. Thus, we find, the plaintiff has not been damaged by an adverse claim of ownership, since that portion of this lawsuit

343

decided in favor of the Government of the Virgin Islands would certainly have been sufficient to give the plaintiff, or any purchaser, cause to consider the need to quiet title.

## IV. ATTORNEY'S FEES AND OTHER COSTS

This was a complex and demanding case which required outstanding counsel on each side. The parties are fortunate that each side met that requirement. At the close of oral argument it was pointed out that the presentation of the case from both sides had been superb. Each side has prevailed to an extent. While the plaintiff has obtained the quieting of title to nearly all of the valuable land involved, the defendant will have title quieted in its favor to two separate areas of submerged land of considerable size, and defendant defeated a claim for substantial money damages.

Further, the defendant will have important future rights coincident with its ownership of the submerged lands, including the possibility of demanding that the plaintiff reopen the pool contained within Plot 327, to permit access to the sea.

 Having all of this in mind, the Court will exercise its discretion to make no award of attorney's fees and other costs, and each of the parties will bear its own costs.

## V. CONCLUSION

We summarize now the disposition of this lawsuit as to each of the twelve counts of the amended complaint:

(1) Counts VIII, IX, X, and XI were decided in favor of the plaintiff, and judgment was entered on November 23, 1982, quieting title to the lands described therein.

(2) Counts I and VII were decided in favor of the plaintiff and judgment was entered on July 13, 1983, quieting title to the lands described therein.

(3) Count II is, by this opinion, decided in favor of the plaintiff, and judgment will enter quieting title in its favor, except that judgment will also enter quieting title in favor of the defendant as to the submerged lands of the pool contained within Plot 327.

(4) Count III is, by this opinion, decided in favor of the defendant, and judgment will enter quieting title to the submerged lands of the marina on which front, in part, Plots 326, 327 and 343.

(5) Count IV is, by this opinion, decided in favor of the defendant and judgment will enter quieting title to the lands described therein.

(6) Count V is, by this opinion, decided in favor of the plaintiff,

and judgment will enter quieting title to the lands described therein.

(7) Count VI is, by this opinion, decided in favor of the plaintiff, and judgment will enter quieting title to the lands described therein.

(8) Count XII is, by this opinion, decided in favor of the defendant, and judgment will enter dismissing this count with prejudice.

## JUDGMENT

THIS MATTER is before the Court for entry of judgment concerning the counts of the amended complaint not heretofore disposed of. The Court filed its Findings of Fact on August 10, 1983, and a Memorandum Opinion containing Conclusions of Law of even date herewith. The premises considered, now therefore it is

ORDERED, ADJUDGED AND DECREED:

THAT title to the following real property is hereby quieted in the name of Alexander Hamilton Life Insurance Company of America, as against any claim of the Government of the Virgin Islands of the United States:

(1) Plot No. 327 of Estate Judith's Fancy, St. Croix, as more fully shown on Public Works Drawing No. 2826 dated June 11, 1970, containing a total of approximately 12.239 U.S. Acres, excepting therefrom, however, the "pool area" described as part of Plot No. 327, containing approximately 2.089 U.S. Acres.

(2) Plot No. 329 of Estate Judith's Fancy, St. Croix, as more fully shown on Public Works Drawing No. 2826, dated June 11, 1970, containing approximately 2.889 U.S. Acres.

(3) Plot No. 343 of Estate Judith's Fancy, St. Croix, as more fully shown on Public Works Drawing No. 3021 dated March 9, 1972, containing approximately 17.530 U.S. Acres; and further

THAT title to the following described real property is hereby quieted in the name of the Government of the Virgin Islands of the United States, as against any claim of the Alexander Hamilton Life Insurance Company of America:

(1) The submerged lands of a portion of Plot 327 of Estate Judith's Fancy, St. Croix, as more fully shown on Public Works Drawing No. 2826 dated June 11, 1970, more fully described as a "pool area" and containing approximately 2.089 U.S. Acres.

(2) The submerged lands of the property commonly known as the "Marina" and designated as such on Public Works Drawing No. 2826 dated June 11, 1970, and Public Works Drawing No. 3021 dated March 9, 1972.

(3) Plot No. 328 of Estate Judith's Fancy, St. Croix, as more fully shown on Public Works Drawing No. 2826 dated June 11, 1970, containing approximately 0.112 U.S. Acre, and further

THAT Count XII of plaintiff's amended complaint be and the same is hereby DISMISSED, with prejudice; and further

THAT each party shall bear its own costs, including attorney's fees.