**COMMODORES POINT TERMINAL CO. et al. v. HUDNALL et al.**

(District Court, S. D. Florida. January 30, 1925.)

No. 215.

1. **Public lands ⬤⟶211—Title to Florida land held derived from Spanish government, though grant subsequently confirmed by United States.**

Where the Spanish Governor of East Florida in 1817 granted a concession of land, which pursuant to his order was surveyed and a plat thereof filed, such action segregated the land from the public lands of Spain, subsequently ceded to the United States, and where, on petition of the heirs of a grantee of the concession, it was later confirmed by the United States commissioners in such heirs as a valid Spanish grant, and such confirmation approved by Congress, the heirs derived their title from the Spanish government, and not from the United States.

2. **Husband and wife ⬤⟶276(6)—Conveyance of ganacial property by widow of Spanish grantee held to convey title.**

The owner of a Spanish grant in Florida, which he acquired by purchase during marriage, died prior to 1825. Under the Spanish law then in force, the land was part of the ganacial property, the ganaciales being subject to the payment of the common debts, and the remainder, after valuation to be divided equally, between the widow and his heirs, possession and administration of the property remained with the widow, with power of sale. The facts relating to the administration could not be shown, but in 1838 the widow conveyed the land by warranty deed. *Held*, that such deed vested title to the entire tract in the grantee.

3. **Estoppel ⬤⟶70(1)—Heirs held estopped to assert title to land after 75 years.**

Where the grantee of land from the widow of the owner of a Spanish grant and his successors in title took and held peaceable possession from 1838 to 1916, during which time it was subdivided and large improvements made

thereon, and it increased in value from $700 to several millions of dollars, the heirs of the husband of the grantor *held* estopped to then assert claim thereto.

**4. Tenancy in common ⬅⟶14—Possession by grantee of entire tract of land from one co-tenant, claiming adversely, is not possession of other cotenants.**

Where one tenant in common deeds the entire property to a stranger, his possession, claiming sole ownership, is not the possession of other cotenants.

**5. Navigable waters ⬅⟶38—Title to land between high and low water mark under Florida statute construed.**

Riparian Act (Laws Fla. 1921, c. 8537), which provides that it shall take effect as of December 27, 1856, and be effective thenceforward, and gives to owners of land lying on a navigable stream the right to fill in, build docks, etc., between their lands and the channel, and vest title to such submerged land in them, construed in the light of its evident purpose, does not vest title to the submerged land in the riparian owners, unless and until such use is made of it.

In Equity. Suit by the Commodores Point Terminal Company and others against Charles F. Hudnall and others. Decree for complainants.

For prior opinion, see 283 F. 150. See, also, 279 F. 606.

E. J. L'Engle, Fleming, Hamilton, Diver & Fleming, P. H. Odom, Reynolds & Rogers, Cooper, Cooper & Osborne, and Cockrell & Cockrell, Knight & Adair, all of Jacksonville, Fla., William K. Jackson, of Boston, Mass., and R. H. Liggett, of Washington, D. C., for complainants.

John W. Dodge, and Stockton & Ulmer, all of Jacksonville, Fla., for defendants.

CALL, District Judge. This cause comes on for final hearing upon the bill of complaint, the answers of the defendants, the replications to that part of the answers of certain defendants praying partition, the testimony taken before the examiner by the parties, and certain depositions filed in the cause. The bill of complaint, with its exhibits, contains more than 240 pages, and I shall not attempt to give a résumé of it, but will refer to Judge Clayton's opinion, filed on the hearing of one aspect of this case, and reported in 283 F. 155 to 162, for a statement of the allegations of the bill.

The defendants, all except Mrs. Wilson, as the executrix of T. M. Wilson, who disclaims, answered the bill, and, as I understand their contentions, claim undivided interests in the lands contained in the "Hudnall grant," as heirs of two of the children of E. Hudnall, to the uplands of said grant,

and to the filled-in lands below high-water mark, along the St. Johns river, under the Riparian Act passed by the Florida Legislature in 1921 (chapter 8537), as owners of the uplands in December, 1856, when the first Riparian Act was passed. The answers pray for partition of the lands held in possession by the complainants as tenants in common.

At the first hearing the defendants filed a motion to sustain various and sundry objections to testimony reserved by them before the examiner. I have examined these objections and motions to strike, but none of them seem to me well taken or of sufficient importance in this case to require any discussion. Said objections insisted upon will be overruled.

[1] The first contention of defendants which I will take up is in respect to the title to the grant. The complainants contended that Hudnall acquired title from the Spanish government through the concession made by Gov. Coppinger to Hogan, who conveyed to E. Hudnall. The contention of the defendants is that this concession did not convey the lands, either in fee or equitably, but that when the commissioners, appointed to ascertain the private land claims under the Spanish government, confirmed the "Hogan grant" to the heirs of E. Hudnall, in 1826, and the report was approved by Congress, the heirs were then vested with title.

In considering this contention, it must be borne in mind that Gov. Coppinger, the Spanish Governor in 1817, made the concession to Hogan for 255 acres of land at the point asked in Hogan's petition, and ordered the lands surveyed, and that in a short time, about two months, the survey was made by the official surveyor, and plat made delineating the concession. It must be that these papers, the petition of Hogan, the concession by the Governor, and the report of the survey and plat purporting to show the lands surveyed in compliance with the concession, were duly returned to the proper officer, as either the originals or copies of same appear in the Spanish archives, delivered under the treaty of cession to the United States, and now in the custody of the commissioner of agriculture of the state of Florida, the custodian of same under the statutes.

I therefore find as a fact from the evidence that in 1817, before the cession by Spain of the Floridas to the United States, a valid concession of the lands in controversy was made to Hogan, and the concession was duly surveyed by the Spanish official whose duty it was to make surveys. As a

matter of law, I find that those proceedings segregated these lands from the public lands of Spain which passed to the United States by the treaty of cession.

I further find as a fact from the testimony that Hogan by his deed vested in E. Hudnall all his right and title to the land in 1818, while the Floridas were Spanish possessions. I further find as a fact that in 1825 the heirs of E. Hudnall, through an attorney, filed their claim before the land commissioners of East Florida, deraigning title through Hogan to the lands, which claim was allowed in said year by the commissioners to the heirs of Hudnall as a valid Spanish grant, duly reported to Congress, and by Congress confirmed in 1827 as such Spanish grant.

Under these facts I find as a matter of law that the title to the lands in controversy comes from the Spanish government. There may be a question whether the title is equitable or legal, there having been no royal grant; but in my view it can make no difference in the decision of the issues in this case. I find as a matter of law that the heirs of E. Hudnall take whatever rights they may have to the lands in controversy through the concession to Hogan, and the confirmation by the United States did not vest in them an independent title derived from the United States. The acts of confirmation are simply recognitions of the Spanish title and a segregation from the public domain ceded to the United States by Spain. What is said above applies to the lands above high-water mark, covered by the concession to Hogan.

[2] The complainants contend that the land was ganancial property. The facts appearing from the testimony are: That E. Hudnall, for a valuable consideration, acquired the title of Hogan in 1818, while the marriage relation existed between him and Elizabeth Hudnall, and while the Floridas were Spanish possessions. Under the Spanish law, property acquired by either spouse for a valuable consideration, an onerous title as distinguished from a gift, devise, or bequest, becomes ganancial. Under this law, the rights acquired by Hudnall from Hogan, whether legal or equitable, become a part of the gananciales. This being so, at the death of Hudnall, the possession and administration of the property remained with the widow, Elizabeth, until the debts were paid, and the value of the gananciales, after payment of the debts, ascertained, then to be divided equally between the widow and the heirs of the dead husband. This power of payment of the common debts out of the gananciales carried with it the power of sale of such as was necessary to pay them. It appears from the proofs that Hudnall at his death left debts. The date of his death is not definitely fixed, but was probably after the change of flags. From the advertisements by the administrators, filed in evidence, it appears that the estate was insolvent, and certain real estate advertised to pay debts. The records of the probate office in St. Augustine, Fla., were destroyed, and so at this late day better proof of the condition of the estate cannot be made. The lands contained in the Hogan concession were conveyed by Elizabeth Hendricks, in 1838, after the death of Hendricks (and who, after the death of Hudnall, intermarried with Hendricks), to David Brown, by warranty deed. The complainants all claim by mesne conveyances from David Brown. Under these facts, I find, as a matter of law, that the deed from Elizabeth Hendricks to David Brown conveyed all the right and title of E. Hudnall in and to the Hogan concession to David Brown.

Contention is made by defendants that Elizabeth Hendricks had released all claim to her ganancial rights by becoming coadministratrix of her husband, Hudnall, by joining in a deed as administratrix, and joining with the heirs in a certain conveyance. These acts do not, I think, evince such an intention, nor do I think they work an estoppel upon David Brown or his successors in title to claim that the property was a part of the gananciales. There is no particle of testimony even hinting at any change of position of the defendants' ancestors by reason of such facts. But, suppose I am wrong in what I have said heretofore as to the ganancial rights of the widow, it seems to me that the defendants are each estopped from, at this late day, making the demands that they do.

[3] In 1825 the concession to Hogan was confirmed to the Hudnall heirs, and this confirmation approved by the Congress in 1827. In 1838 the deed was made to Brown, warranting title to the whole grant, and upon the receipt of said deed Brown went into possession of the entire grant, living upon it, etc., until 1849, when he conveyed it to Brantley and Bryant, who took possession of it in the same manner, disposing of various portions, and putting their grantees in possession, dividing the grant between themselves, and after the division Miss Bryant, who had in the meantime intermarried with Houston, established, with her husband, their home upon the eastern portion of the grant, continuing to reside thereon. The

several grantees of Brantley and the Houstons built and maintained sawmills upon their portions for many years, and these grantees are the predecessors in title of the complainants, and their possession inures to the benefit of the complainants.

No claim is asserted by the defendants, or any of them, until 1916, when the suits for partition by two of them were filed. The testimony proves that the ancestor of two of the defendants did business in Jacksonville in the '50's, and the ancestors of the other defendants lived their lives in this state and in the city of Jacksonville. It seems to me inequitable that the defendants should be allowed to sit quietly by until the lands in controversy should increase in value from $330 in 1818, and $700 in 1836, until 1916, when the partition suits were first brought, and the property had increased in value to many millions of dollars, with thousands of people having built homes and business places upon portions of the grant, and then come and say, "We are cotenants and want our portions."

[4]. It will not do for defendants to rely upon the principle that the possession of one cotenant is the possession of all. As I understand the law, this rule applies in all cases except where the possession of the cotenant is such as to amount to an ouster; and this ouster results where one cotenant deeds the entire property to a stranger, and that stranger takes possession under his deed to the entire tract, claiming sole ownership. In the present case that ouster took place in 1838, during the life of the ancestors of the defendants, and continued during the time intervening from that time until 1921, when the suits in ejectment were brought by two of the defendants. What I have said in regard to cotenants presupposes that Mrs. Hendricks was a cotenant of the heirs of E. Hudnall in these lands.

If it was ganancial property, the heirs, under the Spanish law, had no interest until the value of the gananciales had been ascertained after the payment of the debts, and this is not shown to have ever been done in this case, although some testimony is produced of family talks overheard. Nor does the fact that Brantley, in 1851, procured quitclaim deeds from three of the Hudnall heirs, help the claims of these defendants. There is no testimony showing why this was done, but it may be presumed that at that time there was some talk on the subject. Such action by the grantee was not and cannot be taken as an acknowledgment of such claim, and, even if it

could, it would not inure to the benefit of these defendants, or their ancestors, nor excuse them in not propounding their claim sooner. Procuring such quitclaim deed is explainable as the act of any prudent man, especially when they were procured for a mere nominal consideration.

It is my opinion, therefore, that the complainants have established their case to the relief sought, not only because they claim through the deed of the widow to David Brown, but also because under the evidence the defendants, had their ancestors been tenants in common with the widow, are estopped at this late day from asserting their claims.

[5] I now come to consider the claims of the defendants to the filled-in lands below high-water mark. Prior to the passage of the Riparian Act of 1921, the state of Florida had title to all lands abutting on navigable streams, between high-water mark and the channel, and the abutting owner of the uplands above high-water mark did not acquire title to any lands which might have been filled in; his right being only the riparian right of such owner at common law.

The first Riparian Act of 1856 was declared by the Supreme Court of the state to vest no right in such owner, because it applied only to such owners as held title to low-water mark. So in 1921 the Legislature passed chapter 8537 to cure this defect in the act of 1856. The defendants rely upon this last act as the basis of their title. As I understand their claim, it is that they were cotenants of the abutting lands in 1856, and this last act vests title in such owners to the overflowed and filled-in lands.

Section 3 of the act reads as follows: "This act shall take effect as of the day, to wit, December 27th, 1856, when the act entitled 'An act to benefit commerce,' was adopted by the Legislature of Florida, and shall be continuously effective thence forward and hereafter; and hereby vests in the riparian proprietors and their grantees and successors, in right, the title, right and interest given under the provisions of this act."

The first section of the act, after stating the causes moving the Legislature to pass it, states that the state "divests itself of all right, title and interest to all lands covered by water lying in front of any tract of land owned by the United States or any person, natural or artificial * * * lying upon any navigable stream * * * as far as to the edge of the channel, and hereby vests the full title to the same * * * in and to

the riparian proprietors, giving them the full right and privilege,", etc. (to build docks, fill in land and erect buildings, etc.).

The court will, in construing an act of the law-making power, when the words of the act are of doubtful import, seek to ascertain the intent of the Legislature in passing same, the object to be attained, or the evils to be remedied. Applying these rules to the construction of this act, the intent of the Legislature is plain. It was to vest in the riparian proprietors the right to fill in, bulkhead, and build wharves and docks upon, the lands lying between high-water mark and the channel of the stream, and when said submerged lands were bulkheaded and filled in, to vest full title to same. And section 3 must be given such construction as will carry out this object and intent. By giving it this construction, the defendants, even though they, or their ancestors, were cotenants in 1856, would not acquire any title to those submerged lands, which had been bulkheaded and filled in, as of the date of the suits in ejectment. I am of opinion, therefore, that the complainants have sustained their rights to the submerged lands, bulkheaded and filled in.

The defendants renew the contention as to the right of the equity court to retain this cause and grant the relief prayed in the bill. Those questions are fully covered in the opinion filed by Judge Clayton in this case, reported in 283 F. 150, and I see no reason to dissent from the conclusions there reached.

The defendants in their answer ask for partition. This right has not been sustained, and such relief will be denied. The testimony is so voluminous that I have not attempted any discussion of same, but have merely stated my conclusions therefrom.

A decree will be entered, finding the equities with the complainants, and granting the relief prayed in and by the bill of complaint.