757 F.2d 534
 ALEXANDER HAMILTON LIFE INSURANCE COMPANY OF AMERICA,
Appellee in No. 83-3572, Appellant in No. 83-3600,
v.
GOVERNMENT OF the VIRGIN ISLANDS OF the UNITED STATES,
Appellant in No. 83-3572, Appellee in No. 83-3600.
 Nos. 83-3572, 83-3600.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 14, 1984.
Decided Feb. 28, 1985.
Rehearing and Rehearing In Banc Denied April 1, 1985.
 
 Warren B. Cole (Argued), Isherwood, Hunter & Colianni, Christiansted, St. Croix, U.S.V.I., for Alexander Hamilton Life Ins. Co. of America.
 J'ada M. Finch-Sheen, Atty. Gen., Richard R. Knoepfel (Argued), Chief, Civil & Administrative Law, Laurence Ramer, Asst. Atty. Gen., V.I. Dept. of Law, Charlotte Amalie, St. Thomas, U.S.V.I., for Government of the Virgin Islands.
 Before SEITZ and BECKER, Circuit Judges, and TEITELBAUM, District Judge*
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 On November 12, 1493, during his second voyage to the New World, Christopher Columbus dropped anchor near what is known today as Salt River Bay just off the Island of St. Croix in the United States Virgin Islands. The Carib Indians, understandably disturbed by this invasion of their domain, attacked Columbus's landing party and forced it to retreat before Columbus could claim the land for Spain.[1] Nearly five centuries later, the ownership of this ocean-front property is once again the subject of a dispute, but this time the disputants, a land developer and the Government of the Virgin Islands ("GVI"), have opted to resolve their differences through the judicial process. The result is this appeal and cross-appeal from an order of the District Court of the Virgin Islands quieting title partly in favor of both parties. 573 F.Supp. 429 (1983).
 
 
 2
 The appeal raises several interesting factual and legal issues, including an important question of the rights of a littoral landowner as against the sovereign with respect to fastlands created partly by natural accretion to artificial structures lawfully erected by the littoral owner and partly by the landowner's lawful filling activity. As set out in detail below, we will in part affirm and in part reverse the judgment of the district court, and remand for proceedings consistent with this opinion.
 
 I. BACKGROUND FACTS
 
 3
 Alexander Hamilton Life Insurance Company ("Hamilton") is the successor in interest to the Oxford Corporation ("Oxford"), which purchased hundreds of acres of land in Estate Judith's Fancy, St. Croix,[2] during the latter part of the 1950's. From 1957 through the early 1970's, Oxford subdivided a large portion of this land, title to which is not currently in dispute, and sold the subplots for housing development. The land at issue lies in the northwest corner of the Estate and fronts directly on Salt River Bay, which leads to the Caribbean Sea. Here, Oxford also divided the land into subplots, but channeled its development efforts toward enhancing the value of these parcels of waterfront property by dredging and bulkheading to convert a natural salt pond into a marina opening into the bay (see infra part IIIA). Oxford then constructed a jetty to protect the entrance to this marina. Later, through a combination of Oxford's filling efforts and natural accretion, the area north of the jetty rose above sea level to become fastlands adjacent to the shoreline (plot 329, see infra part IIIC).
 
 
 4
 Oxford also improved a portion of the beach fronting on Salt River Bay, and erected another jetty to protect this beach from erosion. This jetty eventually grew through natural accretion to form additional fastlands (plot 328, see infra part IIID). Finally, land rose above sea level to close off an inlet, creating a small salt pool north of the marina (plot 327, see infra part IIIB). The parties disputed at trial whether this was the result of natural accretion or Oxford's use of artificial fill. With the exception of the alleged creation of the salt pool, all of Oxford's work was carried out pursuant to permits granted by the Army Corps of Engineers ("ACOE") or the United States Department of the Interior ("DOI"). A diagram of the disputed parcels of land follows:
 
 
 5
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEIn 1974, Congress passed the Territorial Submerged Lands Act, Pub.L. No. 93-435, 48 U.S.C. Sec. 1701 et seq. Section 1705(a) of that statute conveyed to the GVI "all right, title, and interest of the United States in lands permanenty or periodically covered by tidal waters up to but not above the line of the mean high tide and seaward to a line three geographical miles distant from the coastline[ ] of the territor[y] of ... the Virgin Islands," including such land as modified by accretion or artificial fill.[3] At approximately the same time, the Oxford Corporation dissolved and Hamilton acquired all of Oxford's rights to the property in Estate Judith's Fancy. In 1978, when Hamilton began negotiations for the sale of this property, the GVI formally asserted ownership over substantial portions thereof based upon its claim that all formerly submerged lands and all lands beneath formerly tidal waters had become its property as a result of the 1974 law. This claim established a cloud on Hamilton's title, rendering the property unmarketable. Shortly thereafter, Hamilton instituted the present action to quiet title. In its amended complaint, Hamilton claimed title to nine parcels of land in Estate Judith's Fancy (plots 326, 327, 328, 329, 331, 343, 344, 347, and 348) and to the adjacent marina.
 
 
 6
 At various stages of the proceedings, the district court quieted title in favor of Hamilton to six plots of land, the disposition of which GVI does not contest on appeal.[4] Four plots are currently in issue: numbers 327, 328, 329, and the land underlying the marina. In its final order issued on October 19, 1983, the district court quieted title to plot 329 in favor of Hamilton. It quieted title to the marina and to plot 328 in favor of the GVI. The court divided one plot of land between the parties: it quieted the fastlands of plot 327 in favor of Hamilton, while it quieted title to a salt pool lying within this plot in favor of the GVI. Joint App. I at 104-05. Hamilton then filed this appeal in which it contests the decision of the district court as to the marina, the salt pool (in plot 327), and plot 328. The GVI filed a cross-appeal, and claims that the district court erred with respect to plot 329 and a portion of the fastlands in plot 327.
 
 II. THRESHOLD LEGAL ISSUES
 
 7
 Before we turn our attention to the rulings concerning the individual plots of land, we believe that it would be helpful to describe briefly the nature of the law applicable to the adjudication of the respective rights of a littoral landowner and the owner of lands submerged under water, because it is only rarely addressed by this court. A littoral landowner is one whose land borders an ocean, sea, or lake.[5] The usual boundary between submerged lands and littoral lands (the latter are also referred to as uplands or fastlands) is the mean high water mark. Due to natural processes and to human efforts, it is not uncommon for this boundary to shift over time. A primary cause of the movement of the mean high water mark is natural accretion. "Accretion is the increase of riparian or littoral land by the gradual deposit, by water, of solid material, whether mud, sand, or sediment, so as to cause that to become dry land which was before covered by water." 78 Am.Jur.2d Waters Sec. 406 (1975). The mean high water mark can also move by avulsion (a sudden and major shift of land), reliction (the withdrawal of water), or human placement of artificial fill. These processes can, in addition, cause the creation of fastlands that cut off a part of the body of water from the whole. See generally id.
 
 
 8
 The ancient rule of the common law is that fastlands created by natural accretion accrue to the owner of the adjoining uplands, because this owner should not be deprived of his access to the sea, which is a major factor in the value of his property, by slow and imperceptible acts of nature.[6] See County of St. Clair v. Lovingston, 90 U.S. (23 Wall.) 46, 66-67, 23 L.Ed. 46 (1874) (citing the Institutes of Justinian, the Code Napoleon, the law of Spain, Blackstone's Commentaries, and Bracton, who was a judge during the reign of Henry III). As this court stated in Burns v. Forbes, 412 F.2d 995 (3d Cir.1969):
 
 
 9
 The right of access to the water in front of his land is the fundamental riparian right which the owner of littoral land enjoys. For it makes possible the exercise of his rights to navigate, to fish, to bathe and to use the water for other purposes. The right of access is, therefore, one of which the littoral is not lightly to be deprived.
 
 
 10
 Id. at 998. The principle applies even if some water is "trapped" between the newly created and the original fastlands, and the lands underneath this body of water also become property of the littoral landowner.
 
 
 11
 The federal common law regarding natural accretion does not apply, however, to fastlands created artificially by the owner. See Burns, 412 F.2d at 997. Rather, there is a distinct body of common law relating to the ownership of artificially created fastlands. Under this body of law, it is well established that an upland owner cannot add to his land at the expense of the owner of adjacent submerged lands by filling in these lands without authorization. Title to fastlands (and land under newly formed bodies of non-tidal waters) resulting from unauthorized artificial fill remains with the owner of the submerged lands. See, e.g., id. at 997-98; Annot., 91 A.L.R.2d 857, 860 (1963) ("A riparian or littoral owner ordinarily cannot ... on his own volition deposit fill so as to extend his shoreline into a stream or other body of water, the bed of which is publicly owned, and as against the public, or its successor, he acquires no new rights in land created by unauthorized filling." (footnotes omitted)); id. at 860-66 (and cases cited therein).[7]
 
 
 12
 Having established the factual and legal setting, we now turn to the specific issues raised with respect to each contested parcel of land. We will explain in some detail the district court's findings of facts and conclusions of law and the particular contentions of the parties regarding each subplot. We will, of course, defer to the district court's findings of fact unless they are clearly erroneous. Fed.R.Civ.P. 52; Interdynamics, Inc. v. Wolf, 698 F.2d 157, 176 (3d Cir.1982). A factual determination is not clearly erroneous unless "that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supporting evidentiary data." Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir.1972). Regarding questions of law, however, our scope of review is plenary. Tustin v. Heckler, 749 F.2d 1055, 1060 (3d Cir.1984).
 
 III. THE INDIVIDUAL PARCELS OF LAND
 A. The Land Underlying the Marina
 
 13
 The marina is a body of salt water that is presently open to the sea through a southern channel leading to Salt River Bay. This channel was dredged by Oxford pursuant to an ACOE permit and is not relevant to the present dispute. Rather, the contested issue is whether, at any time prior to the dredging of the southern opening, the marina (then a salt pond) had a northern opening to the sea and, if so, whether this opening was closed by natural or artificial means. If there was no northern opening, the marina was never tidal, and thus the United States never had title to the submerged lands beneath it. If such an opening existed, however, title depends upon how it was closed. Since there is no record of any authorization to close a northern opening to the sea, closure accomplished through artificial action would not have divested the federal government, as owner of the submerged lands, of title. On the other hand, if closure was by natural means, land underlying the newly non-tidal body of water became the property of Oxford, the upland owner. See supra part II.
 
 
 14
 At trial, the parties introduced maps and aerial photographs of the area, produced at various times since 1799, some of which show the shoreline adjacent to the marina to be open, and some showing it to be closed. For example, an Oxholm chart of 1799 shows a continuous shoreline without any indication of a salt pond, while a Danish Folio map of 1839 shows a salt pond with a single opening to the sea. Similarly, a 1956 public works drawing ("PWD 529") clearly indicates two northern openings, while a 1958 U.S. Geological Service map shows the salt pond to be completely enclosed.
 
 
 15
 The court also heard testimony from three lay witnesses on this point. Testifying on behalf of Hamilton was Rupert Johannes. Oxford's project supervisor in charge of the dredging of the present opening from the marina to the sea. According to Johannes, the marina was completely enclosed when he arrived at the site to begin dredging operations late in 1958. Johannes freely admitted that his work crews pumped water out of swampy areas and deposited artificial fill in various places on the strip of land between the marina and the bay in order to make the land firm enough to support heavy equipment. He insisted, however, that his men merely solidified existing fastlands, and never caused submerged lands to become dry. Joint App. II at 93-98.
 
 
 16
 Daniel Volls and Candido Morales testified on behalf of the GVI. Volls stated that he frequently fished in the salt pond from the early 1930's to about 1940, and that he often took his boat from the pond out into Salt River Bay. Volls also testified that he was part of the survey team which did the field work leading to PWD 529, and that he personally encountered the northern openings as he walked the shoreline in connection with this work. Id. at 32-34. Morales testified that he was familiar with the salt pond for ten to twelve years, through the early 1950's. He stated that the pond had two northern entrances, one being 3 to 4 feet deep at high tide, and the other as deep as 6 feet. Morales testified that he would row into the pond with a boat, but if there was a "current," the boat would be pushed toward the entrance to the sea. Id. at 176-80.
 
 
 17
 Dr. Dennis Hubbard, a Ph.D. and a specialist in marine geology, gave a deposition and testified at trial as an expert witness on behalf of the GVI. Dr. Hubbard testified that, although maps and aerial photographs were indeterminative, he was of the opinion that the marina had, at one time, been open to the sea. Dr. Hubbard's conclusion was based on his analysis of boring and trench sediment studies performed in the southern upland areas surrounding the marina. These studies showed evidence of extensive mangrove complexes and peat burn resulting from mangrove decay. In his deposition, Dr. Hubbard stated that the salt pond must have been open to the sea for a significant period of time for this vegetation to have grown on the southeasterly shoreline and fastlands surrounding the body of water. Joint App. I at 270-71.
 
 
 18
 Assuming PWD 529 to be correct, Dr. Hubbard also stated at trial that it would have been impossible for the 50 foot opening shown by that map to have closed naturally between the time of its drawing, 1956, and the early 1960's, when the parties agree that any such opening no longer existed. The geologist testified that the area surrounding the Virgin Islands is a "sediment starved" system, so that natural accretion on such a large scale could not have taken place so suddenly. On this basis, he opined that the marina had been closed off from Salt River Bay by artificial means. Joint App. II at 244-45.
 
 
 19
 Hamilton did not produce its own expert in marine geology. Instead, it relies on other testimony of Dr. Hubbard to support its claim that the marina, even if once open to the sea, was closed by natural means. Dr. Hubbard acknowledged that, shortly before PWD 529 was drawn, the Virgin Islands were flooded as a result of Hurricane Betsy, and that this devastating storm could have caused temporary openings between the salt pond and Salt River Bay. Id. at 250-53. Hamilton contends that the openings shown in PWD 529 were caused by Betsy (which occurred at most two months prior to its drawing), were not as large as the map suggests, and were closed by natural accretion soon after. Such a conclusion, Hamilton argues, is completely consistent with the remainder of Dr. Hubbard's testimony, since he could not determine whether PWD 529 is accurate, and if it is inaccurate, Dr. Hubbard's testimony concerning the amount of time needed for a 50 foot opening to close by natural means is irrelevant. In Hamilton's submission, the temporary openings caused by Hurricane Betsy were easily and quickly filled in by natural sediment.
 
 
 20
 The district court accepted PWD 529 as accurate, apparently relying upon an examination of the document itself, along with the testimony of Volls and Morales. The court explicitly relied upon the testimony of Dr. Hubbard to conclude that the openings shown by PWD 529 could not have been suddenly closed by natural accretion between 1956 and 1961. Joint App. I at 58. It thus implicitly discredited Johannes's contention that Oxford had deposited fill exclusively on already existing fastlands during this time period. Having found that the marina was, for a significant period of time, open to the sea through a northern passage, and that this opening was artificially closed sometime between 1956 and the early 1960's without any governmental authorization, the district court quieted title in favor of the GVI. Hamilton contends on appeal that the court misapplied the burden of proof and that, as a result, its factual findings are clearly erroneous.
 
 
 21
 According to Hamilton, once it made a prima facie showing of good title, the burden shifted to the GVI to prove by a preponderance of the evidence that the land claimed by the GVI was (1) formerly submerged under tidal waters and (2) reclaimed by unauthorized artificial means. The GVI counters that Hamilton's prima facie showing of good title merely shifted the burden of going forward, but that the burden of persuasion on all factual issues remained with Hamilton. The district court did not address the burden of proof issue in terms.
 
 
 22
 The burden of proof in a quiet title action is not a subject of much discussion in the case law, but venerable and quite basic principles appear to govern. The general rule is that the burden of proof in a quiet title action "rests with the complainant as to all issues which arise upon the essential allegations of his complaint." 65 Am.Jur.2d Quieting Title and Determination of Adverse Claims Sec. 78 (1972); Grace Building Co. v. Parchinski, 78 Pa.Commw. 187, 467 A.2d 94 (1983). Where the defendant in a quiet title action asserts and relies upon a fact as an affirmative defense, however, he has the burden of proving this fact. 65 Am.Jur. Quieting Title and Determination of Adverse Claims Sec. 79. Here, one of the GVI's affirmative defenses is that it has good title to the property in question, not Hamilton. The district court treated this defense as a counterclaim requesting title to be quieted in the name of the GVI, and neither party objected. As a result, both parties were, in effect, complainants in actions to quiet title, and both carried a risk of non-persuasion. "[G]enerally a claimant, whether a Plaintiff or a counterclaiming Defendant, has the burden of persuasion in a quiet title action as to the strength of his or her own title." United States v. Wilson, 433 F.Supp. 57, 66 (N.D.Iowa 1977); accord Dudley v. Meyers, 422 F.2d 1389, 1394-95 (3d Cir.1970). If neither party carries its burden, the court must deny both parties relief by refusing to quiet title in the name of either party. Wilson, 433 F.Supp. at 67.[8]
 
 
 23
 We believe that the district court properly applied the burden of proof. As we read the district court's opinion, the court quieted title to the marina in favor of the GVI, not because Hamilton failed to prove the strength of its title, but because the court found that the GVI had carried its burden of persuasion that the marina was once composed of tidal waters that were cut off from the sea by unauthorized artificial fill deposited by Oxford. As noted above, see supra part II, we must uphold the district court unless this factual determination was clearly erroneous. Despite Hamilton's protestations, we cannot conclude that the court's finding that the marina was closed off from the sea by unauthorized artificial means, which was founded upon PWD 529 and the testimony of Volls, Candido, and Dr. Hubbard, is clearly erroneous. Therefore, we will affirm the court's judgment quieting title to the land underlying the marina in the name of the GVI.
 
 B. Plot 327
 1. Submerged Lands Under the Pool
 
 24
 Plot 327 encompasses approximately 12 acres on the northwest corner of Estate Judith's Fancy. Within plot 327, and proximate to the bay, is a small salt pool. The district court found, and the parties agree, that this pool was merely an inlet until the late 1950's, when, as a result of natural accretion, two spits of land began to grow toward each other, one moving westerly and the other northwesterly, to close off the inlet from the sea. Joint App. I at 56. The GVI contends that this natural process was helped along and closure was completed by unauthorized artificial fill, while Hamilton asserts that the pool closure was brought about solely by nature. As with the marina, the question of whether the pool was closed by natural or artificial means is determinative of ownership: unauthorized actions cannot divest the federal government of title to submerged lands, but the actions of nature can. See supra part II. Relying upon the testimony of Dr. Hubbard, the district court found that the spits were joined by artificial fill, Joint App. I at 56, and it quieted title in favor of the GVI. Id. at 100.
 
 
 25
 At his deposition, which was introduced at trial, Dr. Hubbard testified that, in his opinion, "there was a partial enclosure of [the pool] area by natural processes and some individual supply came along and gave Mother Nature a hand by dumping a bunch of material in there and closing it off." Id. at 256-57. The geologist's conclusion rested upon his comparison of a boring (number 6) taken near the middle of the strip of land separating the pool from the bay (formerly, the spits) and borings taken elsewhere on this strip of land. Boring 6 showed "weathered tuff" to a depth of four and one half feet, a layer of boulders between four and one-half and six feet, and gray-green rock fragments to a depth of nine feet. These materials were not found in the other borings. Dr. Hubbard concluded that the weathered tuff and boulders were definitely artificial fill. He also stated that the gray-green rock fragments, although indigenous to the Estate Judith's Fancy area, "could very well have" been artificially placed on the site. Id. at 254. Since Dr. Hubbard estimated the ground at boring 6 to be five to five and one-half feet above sea level, he stated with certainty that submerged lands had been raised above sea level by human placement of the boulders and weathered tuff. Id. at 252-54.
 
 
 26
 During cross-examination at trial, however, Dr. Hubbard admitted that his initial estimate of the land elevation at boring 6 was incorrect. The report for boring 6 (id. at 347) placed the land in question at 6.7 feet above sea level. In view of this fact, Dr. Hubbard conceded that his earlier testimony that artificial fill went down to six feet was not determinative of whether these fastlands had been artificially created or whether Oxford had merely placed fill on top of existing fastlands raised above sea level by natural means. Nevertheless, Dr. Hubbard adhered to the view that the fastlands near boring 6 had been artificially created, because he believed that it was "likely" that the gray-green rock fragments, which went to a depth of nine feet, were also artificially placed at the site. He also admitted that there was a possibility he might be wrong. Joint App. II at 265-68.
 
 
 27
 Hamilton contends that the district court's reliance on Dr. Hubbard's conclusion was clearly erroneous in light of the geologist's mistake as to land elevation at boring 6.[9] We disagree. Dr. Hubbard testified during his deposition (long before he was aware of any mistake) that, in his opinion, the gray-green rock fragments, although naturally found in the area surrounding Estate Judith's Fancy, were artificially deposited at the site in question. He repeated this belief when confronted with his mistake at trial. If correct, this fact makes the expert's initial mistake as to land elevation irrelevant, as artificial fill would go down to a depth of nine feet, almost two and one-half feet below sea level.
 
 
 28
 We recognize that Dr. Hubbard's opinion is not free from doubt, but there are many cases in which certainty is unobtainable. No closed-circuit television camera keeps sentinel over the weathered shores to record whether indigenous materials are washed up by the waves or are deposited by human beings. Dr. Hubbard has the status of an expert because he has knowledge, training, and experience in his calling, and he is thereby privileged to express an opinion. See Fed.R.Evid. 702. This opinion need not be categorical in order to merit reliance; rather, in the context of a civil case, it simply must be sufficiently persuasive to convince a trier of fact that the expert's opinion as to what occurred is more likely correct than not. Dr. Hubbard's opinion that the pool was artificially enclosed was stated in form sufficient to convince the district court of its validity, and we cannot conclude that the district court's reliance on it was clearly erroneous. Therefore, we will affirm the court's quieting of title to the land beneath the pool in favor of the GVI.
 
 2. Elevated Portion of Plot 327
 
 29
 Despite the district court's factual determination, made in connection with its consideration of the ownership of the pool bottom, that the "considerable gap" (Joint App. I at 56) between the two naturally accreted spits of land separating the pool from the bay was closed by Oxford's unlawful dumping activity, see supra part IIIB.1, the court quieted title to all of the fastlands in plot 327 in Hamilton's favor. The GVI contends that this action was erroneous. According to the GVI, the same rule of law that led the court to quiet title to the pool bottom in the GVI's favor--that artificial activity undertaken without authorization does not divest the owner of submerged lands of title--must also result in title to the unlawfully created fastlands of plot 327 being quieted in its favor.
 
 
 30
 We agree with the GVI on this point. Title to fastlands caused by the adjoining upland owner's unlawful filling activity remains with the owner of the submerged lands, see our discussion in part II, supra, and the district court found that a portion of the fastlands comprising plot 327--the portion between the two spits--was created by such activity. We hold, therefore, that the GVI is entitled to ownership of the portion of plot 327 that was unlawfully raised above sea level by Oxford. However, the district court made no specific findings as to how much of the fastlands of 327 were created in this manner. We will therefore remand this part of the case to the district court for additional factfinding.
 
 
 31
 It is of course possible that, on remand, the GVI will be unable to prove that it owns any of the fastlands beyond its borehole. Although the GVI has prevailed with respect to the submerged portions of plot 327 because of the unlawful filling activity of Hamilton's predecessor, and for the same reason is entitled to prevail with respect to the immediate borehole area, we are mindful of the fact that under the principles set forth in part II, the fastlands accreted to Plot 327 belong to Hamilton in the absence of such proof. Accordingly, failure of GVI to prove its boundaries beyond the borehole will require a conclusion that the entire elevated portion of plot 327 belongs to Hamilton.[10]
 
 C. Plot 329
 
 32
 Plot 329 is approximately 2.9 acres of land surrounded on three sides by Salt River Bay. With respect to this parcel, neither party challenges the facts found by the district court. The GVI, however, contests the court's legal conclusion that led it to quiet title in the name of Hamilton. In our view of the case, the legal issues raised are twofold: first, whether fastlands resulting from natural accretion caused by a jetty constructed by Oxford should nevertheless have accrued to Oxford as upland owner; and second, whether fastlands directly created by Oxford's own filling activity should have become the property of Oxford because the filling was carried out pursuant to governmental authorization.
 
 
 33
 The court found that plot 329 was initially only a jetty extending about 750 feet into the bay. This jetty was built by Oxford pursuant to an ACOE permit dated April 19, 1962 (Joint App. 1 at 151). Pursuant to a second ACOE permit dated February 19, 1964 (Joint App. I at 175), Oxford expanded the jetty into fastlands by dredging and filling so as to prevent the refilling of other dredged areas, to protect the marina, and to convert a swampy area into a beach for bathing. Both ACOE permits contained the following language:
 
 
 34
 NOTE--It is to be understood that this instrument does not give any property rights either in real estate or material, or any exclusive privileges and that it does not authorize any injury to private property or invasion of private rights, or any infringement of Federal, State or local laws or regulations nor does it obviate the necessity of obtaining State assent to the work authorized. IT MERELY EXPRESSES THE ASSENT OF THE FEDERAL GOVERNMENT SO FAR AS CONCERNS THE PUBLIC RIGHTS OF NAVIGATION. (See Cummings v. Chicago, 188 U.S. 410.)
 
 
 35
 The district court found that the fastlands comprising plot 329 grew into their 1974 dimensions through "a combination of artificial fill [deposited by Oxford pursuant to the February 14 permit] and natural accretion," the latter caused by the existence of the jetty and the artificially reclaimed lands. Joint App. I at 70.
 
 
 36
 The court arrived at its conclusion that title to plot 329 should be quieted in the name of Hamilton through an admittedly "tortuous route." Id. at 92. First, the court referred to California ex rel. State Lands Commission v. United States, 457 U.S. 273, 102 S.Ct. 2432, 73 L.Ed.2d 1 (1982). In State Lands, the United States, as upland owner, erected a jetty off the coast of California that resulted in the creation of fastlands through natural accretion. As owner of the submerged lands, California claimed title to the accreted fastlands because, under California law, accretion caused by artificial structures does not become property of the upland owner. Writing for the majority, Justice White stated that "the federal rule [is] that accretions of whatever cause belong to the upland owner." Id. at 285, 102 S.Ct. at 2439. Deciding that federal and not California law applied to the case, the Court held that title to the property in question was vested in the United States.
 
 
 37
 Despite its apparent applicability, the district court was uncomfortable with considering State Lands controlling precedent because the focus of that case was on the choice of law issue, and because the United States (i.e., a sovereign) was the upland owner. Thus, the court looked to other federal cases for support of the Supreme Court's sweeping language in State Lands purporting to set out the federal common law of accretions. The primary case relied on by the court in this regard was United States v. Groen, 72 F.Supp. 713 (D.D.C.1947), aff'd in relevant part sub nom. United States v. Martin, 177 F.2d 733 (D.C.Cir.1948).[11]
 
 
 38
 In Groen, a riparian landowner filled in submerged lands to the bulkhead line and built a wharf short of the harbor line in order to improve his access to the Anacostia River. The court held that a riparian owner "may improve his access to the navigable waters as necessary to the full enjoyment of his property and a practical use thereof, and that he is privileged to fill in and build wharfs." Id. at 721. Furthermore, the establishment of bulkhead and harbor lines indicates the state's willingness for the riparian owner to extend his property to that extent. Id. at 721-22 (quoting with approval Dawson v. Broome, 24 R.I. 359, 362-63, 53 A. 151, 155 (1902)). Accordingly, the court held that the riparian owner was the fee simple owner of the improvements to his land. The Court of Appeals for the District of Columbia Circuit affirmed, but emphasized that the riparian landowner's title was subject to the federal government's navigational servitude. United States v. Martin, 177 F.2d 733 (D.C.Cir.1948). Relying upon Groen, the district court decided that Justice White's statement in State Lands regarding the common law of accretions was controlling in the case of an upland owner who causes natural accretion by his own authorized acts; thus, the court held that Hamilton has fee simple ownership of plot 329 subject to the federal government's navigational rights.
 
 
 39
 The district court's analysis of the federal common law applicable to this portion of the case was only partially correct. Most importantly, the court failed to distinguish between two different, albeit closely related, bodies of common law, both relevant to the case at bar: one regarding naturally accreted land, and the other dealing with land created by artificial means. The court's use of Groen to support the Supreme Court's statement in State Lands about the law of natural accretion illustrates this point, for Groen, as a case involving an artificially created wharf, is not apposite to the question of ownership of land caused by natural accretion.
 
 
 40
 Because of its failure to distinguish between the law of natural accretion and that of artificial fill, moreover, the court did not find it necessary to make specific findings of fact regarding how each part of plot 329 was created. Instead, the district court merely determined that plot 329 arose by "a combination of" artificial fill and natural accretion. Joint App. I at 70. As a result, we cannot resolve ownership of plot 329, because the common law rules applicable to these different situations lead to opposite results on the facts of this case. As we will explain below, title to those parts of plot 329 that became fastlands through natural accretion became vested in the upland owner, Oxford, and should be quieted in Hamilton's favor. With respect to those parts of the plot that were created by artificial activity undertaken pursuant to the ACOE permits, however, title remained vested in the owner of the submerged lands, the United States, and should be quieted in favor of the GVI.
 
 
 41
 First we consider the operative common law regarding natural accretions. If the naturally accreted portions of plot 329 were unrelated to Oxford's construction activities, they would without doubt have accrued to Oxford as the upland owner. See supra part II. The question is whether this outcome is altered by the fact that the natural accretion was caused by the jetty and the fastlands that Oxford artificially created. This question appears to be answered in the negative by the Supreme Court's statement in State Lands that "accretions whatever the cause belong to the upland owner," 457 U.S. at 278, 102 S.Ct. at 2435 (emphasis added). As the district court recognized, however, this statement appears to be an unjustifiably expansive reading of the federal common law, and, at all events, was dicta. In particular, it appears that the federal courts have never been called upon to decide whether an upland owner who wrongfully erects artificial structures becomes the owner of naturally accreted fastlands caused thereby, and some states have decided this question in the negative. See generally, 78 Am.Jur.2d Waters Sec. 410 (1975).
 
 
 42
 Nevertheless, where an upland owner lawfully builds an artificial structure that causes natural accretion, it has long been settled under federal common law that title to resultant fastlands vests in this owner. E.g., New Orleans v. United States, 35 U.S. (10 Pet.) 660, 717-18 (1836); Beaver v. United States, 350 F.2d 4, 11 (9th Cir.1965). Indeed, this was the specific situation presented to the Supreme Court in State Lands, and the Court reaffirmed adherence to the ancient federal rule, stating that "we see no reason at this juncture to adopt California's minority rule on artificial accretions [against the upland owner], even if we were free to do so." 457 U.S. at 284, 102 S.Ct. at 2439. Thus, for the fastlands of plot 329 that are the result of natural accretion, title should be quieted in favor of Hamilton.[12]
 
 
 43
 The fastlands of plot 329 that were directly raised above sea level by Oxford--the jetty itself and the artificially reclaimed lands--are subject to the federal common law of artificially created lands. If Oxford had built the jetty and filled without authorization, there would be no question that title to these fastlands would have remained in the federal government. See supra part II. However,
 
 
 44
 [w]here the reclamation and filling of the adjacent shore or submerged soil was expressly permitted by legislative enactment, or was authorized by a statute fixing a bulkhead, harbor, or dock line, or similar statute, or by a valid license or permit, or by local common law, it has usually been held or recognized that filled land created by a riparian or littoral proprietor belongs to him as part of the upland, at least where the public rights with respect to navigation and commerce are not substantially impaired.
 
 
 45
 Annot., 91 A.L.R.2d at 867. This is most clearly the case when the instrument of authorization expressly includes a transfer of title to the riparian or littoral owner of any land he so builds. See, e.g., Commodores Point Terminal Co. v. Hudnall, 3 F.2d 841, 844-45 (S.D.Fla.1925). The rule has also been applied in the absence of such express language, on the grounds that governmental authorization to create new land implies that such land will accrue to its creator, and upland owners should be able to rely on this implication of ownership. See, e.g., Groen, 72 F.Supp. at 721-22.
 
 
 46
 Since Oxford built the jetty and reclaimed the lands pursuant to valid ACOE permits, it appears at first blush that these portions of plot 329 fall under the latter line of cases in which ownership of artificially created lands is vested in the upland owner responsible for their creation. The permits authorizing Oxford to build a jetty and to fill in submerged lands, however, each contained express notice that it did not give any property rights and indicated only the federal government's assent with respect to the public right of navigation. The question is thus presented whether this notice alters the operation of this aspect of the common law of artificially created land.
 
 
 47
 The district court held that the notice clause merely makes clear that the permit itself does not cause title to pass, but that the clause does not obstruct the passage of title through operation of the common law. We agree that the clause has no effect in the case of naturally accreted fastlands, see supra note 11, but we believe that the clause is of vital importance in the case of fastlands that are artificially created. In this latter case, the notification that the permit "does not give any property rights" applies directly to fastlands created by the activity carried out under the authority of the permit. A fair interpretation of the notice language is that it was intended to supersede any common law rules regarding property created pursuant to the permit and to ensure that title to such property would be in the federal government.
 
 
 48
 Even if the permit language was not intended to supersede the common law, however, we believe that the mere presence of the language in the permit alters the rule that land artificially reclaimed through lawful means becomes the property of the upland owner. As noted above, the rationale behind this common law rule is that one who obtains permission to improve his property should be able to rely on the government's expression of approval for the knowledge that he will become the owner in fee simple of any such improvements. Given an express provision in the instrument of authorization to the contrary, however, the landowner is no longer entitled to rely on the authorization for the transfer of property rights. That is the situation in this case. Thus, to the extent that plot 329 was the result of artificial fill, title should have been quieted in the name of the GVI.
 
 
 49
 In light of the foregoing, we must remand this part of the case to the district court to subdivide plot 329 according to how the various parts of it came into existence, and to quiet title thereafter in accordance with this opinion.[13]
 
 D. Plot 328
 
 50
 Plot 328 is little more than a tenth of an acre of land jutting out from plot 327 into Salt River Bay. The district court found that plot 328 was initially a breakwater built by Oxford pursuant to a DOI permit dated January 28, 1971 (found at Joint App. I at 320), and was subsequently "expanded minimally by natural accretion." Id. at 70. The DOI permit contained the following notice:
 
 
 51
 IT IS EXPRESSLY UNDERSTOOD by the parties hereto that title to all land and or other improvements on federally owned submerged lands resulting from filling and bulk-heading, by the Permittee, is in the federal government....
 
 
 52
 In light of this unambiguous language, the court held that title to plot 328 was vested in the federal government, and it thus quieted title in favor of the GVI.
 
 
 53
 Hamilton concedes that the district court's interpretation of the DOI permit was correct, and that the portion of plot 328 that was built pursuant to the DOI permit was properly quieted in the GVI's favor. Hamilton contends, however, that the district court's conclusion that all of plot 328 was created pursuant to the DOI permit was clearly erroneous. According to Hamilton, at least half of this plot was already in existence when the DOI permit was issued, having been created by artificial activity carried out pursuant to an ACOE permit of May 15, 1963. This permit contained language identical to the ACOE permits leading to the creation of plot 329, to the effect that the permit gives no property rights, see supra part IIIC. Hamilton argues that the portion of plot 328 created by virtue of the ACOE permit should be quieted in its favor.
 
 
 54
 We held in part IIIC that the language in the ACOE permits renders inoperative the common law rule that fastlands become property of the upland owner who, pursuant to authorization, creates them. Therefore, even assuming that the district court was wrong in finding that all of plot 328 was created pursuant to the DOI permit, those parts created pursuant to the ACOE permit would still, under our application of the common law to the facts of this case, have remained property of the federal government. The district court's alleged error, therefore, is harmless. Accordingly, we will affirm the judgment of the district court with respect to plot 328, because we are free to affirm a result reached by the district court for any reason supported by the record. See Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141, 1145 n. 1 (3d Cir.1983).
 
 IV. CONCLUSION
 
 55
 In sum, we will affirm the judgment of the district court quieting title to the marina and the salt pool in favor of the GVI, because we hold that the court's findings of fact are not clearly erroneous. We will also affirm the court's judgment quieting title to plot 328 in favor of the GVI, and its dismissal of Hamilton's fifth amendment takings claim.[14] We hold, however, that the GVI is entitled to the portion of plot 327 that was artificially filled, and we will therefore reverse the judgment of the district court insofar as it quiets title to all of plot 327 in favor of Hamilton; we also will have to remand for proceedings consistent with this opinion to determine ownership of the elevated portion of plot 327. Finally, we hold that title to plot 329 depends upon whether the land was the result of natural accretion or artificial fill, which was not decided by the district court. We will therefore reverse the judgment of the district court quieting title to plot 329 in the name of Hamilton and will remand for proceedings consistent with this opinion.
 
 
 
 *
 Honorable Hubert I. Teitelbaum, Chief Judge, United States District Court for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 The conflict between Columbus and the Caribs, who were cannibals, has been described in this way:
 At noon 14 November, Columbus sent an armed boat with twenty-five men toward a small village at the head of [now Christiansted] harbor. The inhabitants fled, but as the boat returned, a Carib canoe suddenly came around the point. The paddlers at first were stupified by the sight of the great ships, but presently recovered their senses; and although they numbered only four men and two women, picked up their bows and arrows and let fly, wounding two Spaniards, one mortally. Columbus's boat rammed and upset the dugout; but the Caribs swam to a rock where they fought like demons until overcome and taken. A horde of natives in warpaint now ran down to the shore, eager for revenge, but they had no weapons that could reach the ships.
 * * *
 Columbus did not care to tarry at St. Croix, lest the Caribs bring up reinforcements. Having already noted the rounded tops of a number of islands over the northern horizon, he decided to investigate them.
 S.E. Morrison, The European Discovery of America: The Southern Voyages 1492-1616, at 111-12 (1974).
 
 
 [2]
 For an account of how the various parts of the Virgin Islands have come to be designated "estates," see Dudley v. Meyers, 422 F.2d 1389, 1390 (3d Cir.1970)
 
 
 [3]
 The full text of 48 U.S.C. Sec. 1705(a) is as follows:
 Subject to valid existing rights, all right, title, and interest of the United States in lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coastlines of the territories of Guam, the Virgin Islands, and American Samoa, as heretofore or hereafter modified by accretion, erosion, and reliction, and in artificially made, filled in, or reclaimed lands which were formerly permanently or periodically covered by tidal waters, are hereby conveyed to the governments of Guam, the Virgin Islands, and American Samoa, as the case may be, to be administered in trust for the benefit of the people thereof.
 
 
 [4]
 In an order granting partial summary judgment for Hamilton, the district court found that Hamilton had established unquestioned record title to certain parcels in question: it quieted title in the name of Hamilton to three subplots (numbers 331, 347, and 348) for which the GVI did not "set forth any facts as would be admissible in evidence showing that such real property was created from formerly submerged land, or that such real property has not always been upland, located above the mean high water mark." Joint App. I at 26-27. With respect to the remaining parcels of land and the land beneath the marina, the district court ruled that there were disputed facts concerning the manner in which these had ceased being submerged under tidal waters, and it thereupon ordered a trial. Id. at 27-28. Immediately following trial, the court quieted title in the name of Hamilton to two more subplots (numbers 326 and 344) that it found were fastlands not created by unlawful artificial fill. Id. at 52-53. Regarding the remaining four plots and the marina, the court made written findings of fact and ordered counsel to brief and argue the legal issues. Along with the parcels of land disputed in this appeal, the court quieted title to plot 343 in Hamilton's favor in its final order
 
 
 [5]
 Littoral landowners are similar to riparian landowners, whose land borders on a river or stream. Generally speaking, the special property rights of littoral and riparian owners are the same, and cases dealing with one type of waterfront landowner are freely applied when adjudicating the rights of the other
 
 
 [6]
 The district court made the initial determination, which neither party contests, that all legal issues in the case should be decided with reference to federal (as opposed to Virgin Islands) common law. The court noted that all of "the events that gave rise to the action to quiet title herein" occurred prior to 1974 when the United States was the owner of the submerged lands surrounding the Virgin Islands. Id. at 89. Thus, the court stated, the rights of the parties depend solely upon the rights of their predecessors in interest, Oxford and the United States. "[U]nder these circumstances, federal common law would apply, since no right of the Virgin Islands as a 'state' or equivalent sovereign would come into play." Id. at 90. We agree that, since this is "a dispute over accretions to oceanfront land where title ... was derived from the Federal Government[,it must] be determined by federal law." California ex rel. State Lands Comm'n v. United States, 457 U.S. 273, 283, 102 S.Ct. 2432, 2438, 73 L.Ed.2d 1 (1982); see also Hughes v. Washington, 389 U.S. 290, 292, 88 S.Ct. 438, 439, 19 L.Ed.2d 530 (1967)
 
 
 [7]
 In part III, we address two more difficult legal issues. First, we consider whether the law of natural accretion is altered by the fact that the natural accretion is caused by action of the upland owner to whose property the accretion accrues. Second, we address whether the law of artificially reclaimed land is altered by the fact that the upland owner's filling activity is carried out with the authorization of the owner of the submerged lands
 
 
 [8]
 Such stalemates are rare, however, because in the absence of other evidence, the statutory or common law often supplies a presumption of title in favor of one or the other party. See Wilson, 433 F.Supp. at 66
 
 
 [9]
 As in the case of the marina, Hamilton contends that the district court's error in factfinding with respect to the salt pool was caused by its misapplication of the burden of proof. For the reasons stated in connection with our discussion of the marina, we believe that this contention is without merit. See supra part IIIA
 
 
 [10]
 To hold that GVI is entitled to the borehole area but nothing more would be an unreasonable result in terms of land title
 
 
 [11]
 The district court also cited Roberts v. Brooks, 78 F. 411 (2d Cir.1897), and United States v. Stoeco Homes, Inc., 498 F.2d 597 (3d Cir.1974)
 
 
 [12]
 The existence of the notice in the ACOE permits that "this instrument does not give any property rights" does not alter this conclusion. This language does not purport to reach naturally created lands. Moreover, we see no reason why the existence of the language should have an effect on property rights obtained through operation of the ancient common law rule of natural accretion, which is designed to protect a littoral owner's access to the sea. See supra part II. This is in contrast with the effect of the notice on ownership of artificially created fastlands, discussed immediately infra
 
 
 [13]
 The district court might find it impossible to subdivide plot 329 according to how various parts of it came to be uplands because of the scarcity of available evidence. If this is the case, the court should determine the primary cause for the plot's existence--natural accretion or artificial fill--and quiet title accordingly
 We note, however, one further possibility. If there has been natural accretion along the artificial fill, the GVI as owner of the artificially created land may also be a littoral owner to whom such accretion belongs, in which case the natural accretion would have to be divided in some fashion between the two littoral owners, the GVI and Hamilton. This might depend upon the configuration of the accretion. We cannot speculate on how the record will develop, hence we leave this matter to the district court in the first instance.
 
 
 [14]
 In Count XII of its amended complaint, Hamilton requested damages on the grounds that the GVI's claim to title rendered all of Hamiltons property in Estate Judith's Fancy unmarketable, amounting to a taking of its property without just compensation in violation of the fifth amendment to the United States Constitution. The district court dismissed this count, Joint App. I at 101, and we will affirm. The contention that the GVI's mere assertion of a (legitimate) claim to property constituted an unconstitutional "taking" is frivolous